COURT OF THE DISTRICT OF COLUMBIA, UNITED STATES OF NORTH AMERICA

CR. No. 03-331-13

CR. No. 03- 331-14

ELIO ELIXANDER LORENZANA CORDON, through his defense attorney, appears before the Honorable Judge Collen Kollar-Kotelly, United States District Judge, to present MOTION, to reexamine the statements made before the JURY, and which led to a statement of guilt against me.

I E X P O S E

1.- The Honorable Judge, has given me the opportunity to express my disagreement with the testimonies exposed to the Jury, which led to the conclusion that my person participated in the commission of Illicit offenses punishable by the United States of North America. -

I will refer to the steps that led my country to grant my extradition to be tried in this country.

In criminal case 03-331 filed on March 10, 2009, the Court of the District of Columbia filed an accusation on the charge of Conspiracy to distribute a controlled substance with the intention or knowledge that said substance would be imported into the United States. In violation of United States Code 21, Section 959 and 963, this order was known to the Honorable John M. Facciola, District Judge of the United States of the District of Columbia, in which probable cause was established to believe that it was responsible for the crime for which I am accused.

EXHIBIT 4

The Drug Control Office initiates an investigation and states that approximately in June 1999, the investigation of the organization HERRERA GARCIA, which supposedly was operating in Guatemala, began at the end of 1990. Having identified OTTO HERRERA GARCIA, as Leader of this organization, identifying Guillermo Herrera García as Logistics Coordinator of that organization.

This investigation exposes that Herrera García, hires other people for the drug transport within the Republic of Guatemala, and establish a period of time between 1990 until at least 2003.

In this sense, the State of Guatemala signed an extradition treaty signed in 1903, which entered into force on August 15, 1903, this treaty was amended by the Supplementary Convention signed on February 20, 1940 and entered into force on March 13, 1941, this is the legal basis to be able to request the extradition of my person, this is how after carrying the

respective procedure, my country gave me to the United States of North America, so that this country would judge me, and within the parameters set by this treaty are also clear when I say that I should be judged under the parameters for which I was requested in extradition. And that at no time can I be tried for other crimes for which I was not given extradition.

I refer to the order issued by the Third Court of Criminal Sentencing, Drug Trafficking and Crimes against the Environment, of the Republic of Guatemala, dated February 17, two thousand and twelve

In this order the judge states that the acts attributed to me occur between the year 1999 until at least 2003, which was the request made by the United States of America, and my extradition is granted under the request of the United States of North America, and it is for the crime of Delictive Assosiation as to import five or more kilograms of cocaine to the United States, and to prepare and distribute five or more kilograms of cocaine, pretending and knowing that cocaine would be illicitly imported into the United States to help and incite with violation of Title 21, sections 812, 950, 952, 959, 960, and 963, Title 18 of the United States Code, offense for which I was requested and surrendered in extradition and in accordance with the aforementioned Treaty is the only crime for which I may be judged.

In the same sense Government Agreement number 92-2015 dated March 9, 2015, Issued by the President of the Republic, and signed by the ministers confirm my extradition and in its article 1. Deliver in extradition to the Government of the United States of America to the Guatemalan ELIU LORENZANA CORDÓN and / or ELIO ELIXANDER LORENZANA CORDÓN, previous written offer of the Government of the United States of America, that the requested one will have all the rights and guarantees that in accordance with the Constitution of that Nation correspond to him, particularly that he will be considered innocent until he is found guilty, that his trial will be totally impartial, that he will be provided with a lawyer for his defense, that he will not be tried for different crimes for which his extradition is granted and that his human and procedural rights.

To the tenor of the exposed ones: I refer that said precepts were not fulfilled to thoroughness since I was judged under other parameters not requested in the extradition.

2.- OF THE WITNESSES: If we place ourselves to the presented by the witnesses and the fallacies that expose to the Jury, and in which they try to give me the quality of leader of the Organization:

What is meant by leader? The word leader comes from the **English *leader*. Leaders are defined as people capable of guiding and influencing other people or groups of people, which is also recognized as such.**

understanding that Leader is the person who influences and makes decisions, according to the statements of witnesses at no time can fit the behavior of Elio Lorenzana Cordón, within the quality of Leader, as it does not influence or make decisions and say the witnesses themselves at no time is the quality of leader and understanding the

statements, the only one would be a person could be framed in a worker, someone who receives orders and depends on the decisions of the main leaders of an operation.

Honorable Judge you can locate these statements in statements made by:

OTTO HERRERA GARCIA: described below, which shows that my person was never the leader of any criminal organization.

In relation to the alleged carrying of firearms mentioned by the Honorable Judge, I am aware that these charges were resolved in my country, since a trial was held and it was determined that I had no responsibility, this criminal cause is identified with the number 302-99 and was known by the Court of First Instance of Retalhuleu, THIS FACT WAS NEVER PLACED IN KNOWLEDGE OF THE JURY, which is why it would be that IF THE JURY HAD DIRECT KNOWLEDGE THAT IN THIS CAUSE I WAS LIBERATED FROM SUCH CHARGES AND DETERMINED MY INNOCENCE, HOW CAN BE JUDGED TWICE FOR THE SAME FACT AND IS MORE INTENDED TO GIVE ME A WORSE PENALTY DUE TO THAT CASE, THIS GIVES THE GUIDE THAT THE PROCESS WAS VIOLATED AND THAT SUCH CASE SHOULD BE place of knowledge of the Jury, so that they had direct knowledge that could have caused the statement made by them to vary, I do not want Honorable Judge, to hinder the work that you do only, but I just want to have the opportunity to provide all the means of proof that were not exposed to the jury and that due to the confidence that one puts in the Lawyers who defend him, since I, I am not aware of your laws, I trusted in my defense, and all the time they deceived me, I did not have access to justice.

3.- As you can see Honorable Judge, in relation to VINICIO REYES SOSA, throughout the trial was manifested by the Witnesses that sought the Lorenzana Family, for the fact that VINICIO REYES SOSA, had been captured, and that that was the reason, that they were looking for us:

I refer Honorable Judge, that the poured by the witnesses is false if you can observe the declaration of BYRON LINARES CORDON: discharged with date:

FEBRUARY 25 DAY 8

Paging 48

Line 2    I received the money directly and sometimes I coordinated so that money could be received in Mexico City.

Line 10 That money was handled by us in Guatemala City

Linea 12 Specifically we handled this money in Zone 14 in Guatemala City

Paging 49

Line 3 It was left's call it the financial center of Otto Herrera's organization it was where the money was handled all the money was handled

Paging 50

line 13 Because most of my books had a ready them destroyed or shredded. By this time, date. Mr. Otto Herrera had already moved to live Mexico.

Line 21 It was money that was coming from this profits from the cocaine, the drug trafficking in the El Salvador operation and that was the drugs that were coming in airplanes to Guatemala

Paging 60

Line 5, These house contained everything belonging to the Otto Herrera Organization, and the consequences, that is when this happened was that the operations of the cocaine trafficking ceased completely with the operations of the cocaine traffic of the Otto Herrera Organization.

FEBRUARY 23 DIA 2

Paging 7

Line 3 In additions to the request that Mr. Herrera was making in terms of how the organization would the run in the new Year—due the recent capture of---Vinicio Reyes Sosa.

a comment was made that be was going to have his own storage house.

Paging 17

Line 2 Well, Mr. Herrera's project or plan, given the capture of Mr. Vinicio Reyes was to store the drugs in Izabal and go well them also in that same department.

Paging 18

Linea 3 We would have been talking about approximately the end of January, the year 2000

FEBRUARY 25 Día 4

paging 17 line 5   Now, what time period are we talking about Now?

Line 6 November of 1999

Paging 36 Linea 16 who had the Security?

Line 17 Otto Herrera

Line 18 Who was the leader present?

Line 19 Otto Herrera

Paging 54 Line 21 No, sir, not all of them. As I indicated before, at the end of the 2002, Otto Herrera moved to Mexico.  And there were after looking through all the book, many were destroyed with the authorization of Otto Herrera. And those books have a clear notation as to the date, the person, the persons involved and the amounts.

Paging 64 Linea 3 Yes, Your Honor, it is three one of them already die, passed away.

Line 7 Vinicio Reyes Sosa He's the one that already passed away Enio Reyes Sosa

Line 12 I missed one of the names, counsel. And Irvin Reyes Sosa

Line 23 I can tell you, counsel, that this is an organization and the leader is Enio Reyes Sosa, and we Knew him as Enano

Line 13 No, but they got mostly that which came in flights.  Because these were one of the people that got the entire shipment and Otto sold them the cocaine on credit. But I remember that on a couple of occasions they got drugs sent to them from the

drug that arrived at La Reforma, and specifically to the warehouses of the Lorenzana-Cordons.

Line 20 Where the Reyes Sosa Family from?

Line 21 From Guatemala

Line 22 Which of the brothers passed away?

Line 23 Vinicio

Line 24 When did he die?

I think it was in 2001, counsel.

FEBRUARY 23 day 3

Paging 16 Line 11 One was a Colombian supplier of drugs, Colombian. The other negro was Ervin Reyes Sosa. He was sold only a few number of times, a small amount of drugs. And regularly Otto would ask me to write those down under my name or to put it under Officine, office. So then that organization, the Reyes Sosa Organization, would be sold entire amounts of the shipment of drugs. And we wouldn't—I would write it down as negro as the buyer, but the name of his brother would appear because he was in charge and the leader of he organization as Enano.

Line 23: It would be Ervin Reyes Sosa, the brother Enano Reyes Sosa, which is the negro that had a connection to the organization.

Paging 26

Linea 14 This is some money that Otto Herrera lent to Vinicio Reyes Sosa

Paging 37 Line 20 This I cannot tell you for sure whether it is something that came by air because this contract refers specifically to the organization of the Reyes Sosa brothers.

Day 6  paging   108  a 112

I refer that Mr. VINICIO REYES SOSA, was initiated a process against him, on January twenty of the year two thousand but was captured in November of two thousand one and released at the beginning of October two thousand and two, within the case 855-2000, later he died on October thirty-first of two thousand and two, according to what the witnesses said, the Lorenzana Family was sought because this person had been captured, but it is clear from the statements that the Head of the Organization was ENIO REYES SOSA, therefore there was no reason to look for the Lorenzana Family, if the Head of the Organization was free, THIS INFORMATION WAS NOT PUT ON THE KNOWLEDGE OF THE JURY WHO DECLARED GUILTY TO ME AND WHO DEVIOUSLY HAVE PROVIDED THESE INFORMATION THAT WAS VITAL SO THAT THEY COULD SEE THE CREDIBILITY OF WITNESSES.

DECLARATION OF OTTO HERRERA GARCIA

Paging 35 Line 13 I'd say it must have been around 98

Paging 36 Linea 6 I think this was around 99

Paging  90

1.- Q. And what would you be setting the cocaine at if you were offered the opportunity to sell the cocaine in the United States?

4.- A  don't - it where's the prices it depends on which area of the United States, you Self it they all have afferent prices

7.- Q. So, what of any opportunity was Mayo Zambada offering to you

9.- A He was proposing his stepson had a direct route into California and that I would very welcome to use it if wanted to.

13.- Q. And what if anything did they express the Sinaloa Cartel about the reliability of that route to California?

15.- A. It was very efficient

16.- Q. And how frequently did they indicate that kilos were moving across the border into California?

18.- A. they were constantly being moved

19.- Q. What if anything did they express about the possibility of intediction of those kilograms of cocaine?

21.- A. It was a most a sure shot that's what they said

22.- Q. I'm sorry

23.- A. It was almost a sure shot That means very efficient and also emphasized on the high price of the cocaine in California as you Know in comparison with the price in Guatemala.

Paging 95

1.- Q. And when you say risky just describe what you mean by risky

4.- A. There is always the task of going through the border and being inspected you know it has to go through the border.

7.- Q. So, then I'd ask you if you have an understanding as to why this price of the cocaine was higher in the United States?

9.- A Because of the cost it requires and the risk it takes to bring it into the United States?

11.- Q. And were you yourself- did the Zambada describe at all the state of the cocaine market in the United States?

13.- A. Yes, sir

14.- Q. What did they say?

15.- A. That it was a sure market and that it would it take long to self the cocaine

17.- Q. So, what if any conclusion did you reach about the quality of the ability to move those kilograms of cocaine in the United States?

20.- A. That they could do it

21.- Q. So, what was your decision with regard to this offer which the Zambada Offered to you?

23.- A. At that time i don't take it I had already had a bad experience with that already I had the it before and I had lost my money and I had lost shipments, So I told them that I was getting enough in Guatemala.

Paging 96

2.- Q. When you say you had a bad experience just describe what you mean by that

4.- A. I had pond in a couple of times a Colombian in a venture up to the United States And the first occasion cocaine got stoke at the border between Mexico and the United States the Second occasion the cocaine reached Dallas it was sold and them the money was seized. We recovered the money and the money was seized on its way down to Guatemala in Falfurrias Texas

11.- Q. Did you have in your dealings with the defendant's strike Eliu Lorenzana-Cordon and Waldemar Lorenzana Cordon did you pass on the offer or engage in an investment opportunity strike that

Did you pass on the offer which the Zambada made to you to the Lorenzana-Cordons?

17.- A. Not really, I think it was in-- with regards of Waldemar Lorenzana Jr it was the other way around

In these statements, Honorable Judge, you can see that the declarations made by Otto Herrera García in relation to the ones exposed in the questioning on page 95.96 states that Mayo Zambada offered to send Cocaine to the State of California, United States of America, and that he denied this request because he had a problem and refused to do it then, how it can be said that my person imported drugs into the

United States? If the one who was Head of the Organization refused to carry out the act, the question Judge is what paper intend to foist me, as to send drugs to the United States, if the same Otto Herrera Garcia says he refused to that request.

As regard of what the Special Agent Stephen Fraga's exposed before the Grand Jury within the Sworn Statement in Support of the Extradition Request dated December 9, 2011, in paragraph 29 he states: FC1 He said that ELIU ELIXANDER LORENZANA CORDÓN, and the accomplices Byron Linares, Otto Herrera Garcia, Haroldo Lorenzana and Waldemar Lorenzana Jr., met in Guatemala, in approximately February 2004 to talk about the confiscations of the previous year, and specifically, the fact that the major books of Linares were between the documents confiscated in Zone 14 in Guatemala City.

It is a completely false thing because, according to the witness Byron Linares, he was detained in jail, due to this confiscation and the same witness indicates that Otto Herrera, who was living in Mexico City since 2002, the declaration of the Special Agent is false, as of the Witness Linares, which leads to the commission of the crime of Perjury.

CONCLUSION:

For the above mentioned Judge, I request that a review of the cause exposed before the Jury be carried out, and that it led to my being declared guilty, of actions that I did not commit, in this sense, Judge, when carrying out a thorough analysis of what I expose you, and being that the JURY DID NOT HAVE EXACT KNOWLEDGE OF THE EVIDENCE, since they were never exposed to their knowledge so I remain in a state of

defenselessness and in violation of a due process, which like every human being, I have the right, that a NEW TRIAL be initiated, so that I can contribute and expose all the evidence that was never known by the Jury, and that my Sacred Right to Freedom is in Game, for which I request that you reconsider granting my freedom, and a new Trial is made, so that the JURY CAN HAVE ACCESS AND FULL KNOWLEDGE OF ALL THE LIES, which were elucidated in the trial.


ELIO LORENZANA.