# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES,<br>        v.<br><br>ELIU LORENZANA-CORDON (13),<br>        Defendant. | **Criminal Action No. 03-cr-331-13 (CKK)** |

## ORDER
(January 18, 2018)

On April 2, 2009, a federal grand jury returned an indictment against Defendant Eliu Lorenzana-Cordon charging Defendant with conspiring to manufacture, distribute and import cocaine into the United States from in or around March 1996 through 2009.  Defendant was subsequently extradited to the United States from Guatemala.  On March 22, 2016, after a five week trial, a jury returned a guilty verdict against Defendant.

After numerous post-trial motions were filed and resolved, the Court held a hearing in this criminal action on November 1, 2017 to sentence Defendant.  The Court began the sentencing, but at the time for Defendant's allocution, Defendant—speaking on his own behalf—raised a number of issues regarding his trial and sentencing that the Court concluded needed to be considered and resolved before sentencing went forward.  *See* Nov. 1, 2017 Hearing Transcript, ECF No. 971 ("Tr.").  The Court continued Defendant's sentencing until those issues could be thoroughly addressed and resolved, and gave both parties an opportunity to brief them. The Court also ensured that the Court's Interpreting Service provided a federally-certified interpreter to assist Defendant and his counsel as they met to prepare Defendant's submissions. Defendant has since filed his submissions in the form of additional motions for post-trial relief: a [975] Motion for New Trial ("Def.'s First Mot."), and a [982] Second Motion to Reconsider the Denial of Defendant's Revised Motion for a Judgment of Acquittal and for a New Trial or in the

1

Alternative for the Release of the Defendant ("Def.'s Second Mot.").  The Government opposes both motions.

      The Court has now carefully reviewed the transcript of the November 1, 2017 hearing and considered all of the discernable arguments raised by Defendant at that hearing and in his subsequent pleadings.  Upon consideration of the parties' submissions,[1] the relevant legal authorities, and the record as a whole, the Court will not grant either of Defendant's new motions.  As a threshold matter, the motions are untimely and would be denied for that reason alone.  Defendant's arguments were available to him at or immediately after his trial, and therefore needed to be raised within 14 days of the verdict.  *See United States v. Thompson*, No. 12-CR-266 (ABJ) (3), 2017 WL 3278828, at *2 n.2 (D.D.C. Aug. 1, 2017) ("A motion for a new trial under Rule 33, and a motion for a judgment of acquittal under Rule 29, must generally be filed within fourteen days after the verdict.").  Nonetheless, the Court addresses the merits of the key, discernable arguments that Defendant has raised below.

---

[1] The Court's consideration has focused on the following documents:

- Def.'s Mot. for New Trial, ECF No. 975;
- Gov.'s Resp. to Issues Raised at Def.'s Sentencing, ECF No. 976;
- Def.'s Second Mot. to Reconsider the Denial of Def.'s Revised Mot. for a Judgment of Acquittal and for a New Trial or in the Alternative for the Release of Def., ECF No. 982;
- Gov.'s Resp. to Def.'s Third Mot. for New Trial, ECF No. 985;
- Def.'s Reply to the Gov.'s Resp. to Issues Raised at Sentencing, ECF No. 986;
- Gov.'s Opp'n to Def.'s Second Mot. to Reconsider the Denial of Def.'s Revised Mot. for a Judgment of Acquittal and for a New Trial or in the Alternative for the Release of Def., ECF No. 990.

The Court has also considered all portions of the record cited by either party, including all of the trial transcripts referenced by Defendant at the November 1, 2017 hearing, as well as all of the Court's prior Orders that were relevant in any way to the issues presently before the Court.

## A.  Extradition Affidavits

Defendant argues that certain statements in two affidavits in support of extradition prepared by Drug Enforcement Administration ("DEA") Special Agent Stephen Fraga and former Special Agent Janet Turnbull were inconsistent with testimony that was elicited at trial. These challenges are not timely or appropriate at this stage of the case.  "A defendant in a criminal prosecution who has been extradited from a foreign country may not procure his discharge by showing that the extradition proceedings were irregular or illegal, or that they were not conducted in good faith."  *See United States v. Sensi*, 664 F. Supp. 566, 569 (D.D.C. 1987) (internal quotation omitted), *aff'd on other grounds*, 879 F.2d 888, 895 (D.C. Cir. 1989).  The alleged inconsistencies Defendant refers to may have been grounds for impeachment at trial, but cannot be used by Defendant to overturn the jury's verdict.[2]

Nonetheless, the Court has considered the merits of Defendant's arguments.  It has reviewed all of the citations referenced by Defendant, and has found no material inconsistencies that would have any effect on Defendant's sentencing or his entitlement to a new trial or acquittal.  In fact, upon review of most of the material referenced by Defendant, the Court has not found anything that would even arguably constitute an inconsistency.

The only aspects of these affidavits that were *potentially* contradicted by trial testimony and warrant any discussion by the Court were statements in the affidavits that Defendant and his co-conspirators, including Byron Linares, met in Guatemala in "approximately" February 2004.

---

[2] To the extent Defendant argues that the portions of the extradition affidavits that are not reliable were necessary for the Government to avoid a statute of limitations defense, this argument fails for the same reason—Defendant is not able to challenge the extradition affidavit in this manner. Moreover, the Court has already denied Defendant's statute of limitations argument.  *See* June 2, 2017 Mem. Op. and Order, ECF No. 931 at 23-26.  The evidence at trial supported a conspiracy lasting well into the statutory period.

*See* Def.'s First Mot., Ex. 1 at ¶ 29; Def.'s First Mot., Ex. 3 at ¶ 34.  Defendant contends that "the meeting described was impossible," Def.'s First Mot. at 2, because Linares testified at trial that he was arrested on May 22, 2003 and incarcerated for fifteen or sixteen months.  *Id.*  In other words, if Linares' testimony at trial is accepted, the meeting described in the affidavits either occurred at a different time, or Mr. Linares was not present at that meeting.

Defendant's argument does not work on multiple levels.  Even if the trial testimony was correct and Linares had not yet been released from prison by February 2004, the extradition affidavits merely indicate that February 2004 was the "approximate" date of this meeting.  By only purporting to *approximate* the date of the meeting, the affidavits account for the fact that the meeting could have occurred at a later time.  Linares was, after all, apparently released from prison only slightly later than February 2004.  Accordingly, Defendant has not actually established that the extradition affidavits were factually inaccurate.

Perhaps more importantly though, this issue is immaterial.  Even if the Court were to find that the date of the meeting was stated inaccurately in the affidavits, or that Linares was not actually at the meeting described, this minor mistake is not important to any legal or factual issue in this case.  The only even vaguely important point about this meeting was that it took place between Defendant and his co-conspirators at some point after a major government raid on the Otto Herrera Drug Trafficking Organization ("DTO") in 2003.  During that raid, Guatemalan authorities seized ledgers written by Byron Linares detailing the conspiracy's drug trafficking operations and implicating Defendant and his co-conspirators.  The subsequent meeting described in the affidavits was apparently held to discuss the implications of this seizure.  Neither party has directed the Court to any portion of the trial record where the exact date or the exact list of participants of this meeting were important issues.  Perhaps Defendant's argument

4

would carry more weight if his evidence showed that he *himself* could not have been at this meeting (though the Court is not holding that even this inaccuracy would be significant), but it does not. The fact that trial testimony was potentially inconsistent with extradition affidavits on the date of a meeting, or whether one of Defendant's particular co-conspirators was at that meeting, is simply immaterial.

For all of these reasons and more, Defendant's request for a *Franks* hearing is misguided. As an initial matter, the *Franks* doctrine, which deals with search warrant affidavits and the Fourth Amendment, is irrelevant in the context of Defendant's extradition. *See United States v. Valencia-Trujillo*, 573 F.3d 1171, 1183 (11th Cir. 2009) ("*Franks* has never been applied to affidavits used for the extradition of foreign citizens. We are unpersuaded . . . that it should be."). But even if the doctrine did apply in this context, Defendant would not be entitled to such a hearing. "A movant seeking to obtain a *Franks* hearing 'must show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth.'" *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010) (quoting *United States v. Richardson,* 861 F.2d 291, 293 (D.C.Cir.1988) (per curiam)). As the Court has already discussed, Defendant has not demonstrated that the extradition affidavit contained any false statements. Moreover, the Court wholly disagrees that Defendant has made "a preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth" was included in the extradition affidavits. Def.'s First Mot. at 3. Even if the affidavits contained any inaccurate information—which the Court has already concluded that they do not because they merely approximate the date of the meeting—there is certainly no evidence that the falsity was included knowingly, intentionally or with reckless disregard. Defendant's bald

assertions otherwise are simply baseless.  Moreover—also as discussed above—the alleged false statements were not material.   Even without them, the extradition affidavit clearly established Defendant's involvement in the illegal drug importation conspiracy.

For the reasons laid out above, Defendant's argument about allegedly false statements in extradition affidavits is rejected.  This argument has no effect on Defendant's sentencing and does not entitle him to a new trial, judgment of acquittal, release or a *Franks* hearing.

## B.  Testimony Regarding Vinicio Reyes Sosa

At the November 1, 2017 hearing, Defendant cited a number of passages of trial transcript that mention an individual named Vinicio Reyes Sosa.  *See* Tr. 30:16-31:12, 32:10-15; 33:16-34:2; 34:7-17; 38:17-25.  The Court has carefully reviewed all of those passages.  In summary form, Defendant's argument based on those portions of the record appears to be that Government witnesses inaccurately testified that the reason the Otto Herrera DTO sought Defendant's services in a drug trafficking conspiracy was that they were concerned that Vinicio Reyes Sosa, who had previously provided those services, had been detained by Guatemalan law enforcement in early 2000.  Defendant claims that Vinicio Reyes Sosa had not, in fact, been arrested by that time.  Moreover, he argues that the "head" of Vinicio Reyes Sosa's "organization" was still free, and accordingly, regardless of Mr. Reyes Sosa's circumstances, "there was no reason to look for the Lorenzana Family."  Def.'s First Mot., Ex. 4 at 10. Defendant has attached what appear to be Guatemalan records to his pleadings that, he claims, show that Mr. Reyes Sosa was only detained at a later date.

The Court has carefully reviewed all of the portions of the record that Defendant has cited.  None of them merit granting Defendant's motions for acquittal or new trial, and none of them have any relevance to Defendant's sentencing.  As an initial matter, the Court's review of

the trial transcripts suggests that there was some confusion at trial as to exactly when Mr. Reyes Sosa was detained. *Compare* ECF No. 774 (Feb. 23, 2016 Trial Transcript, morning) at 117:19-22 (discussing how Otto Herrera told Linares at the outset of 2000 that he was worried because Vinicio Reyes Sosa had been captured) *with* ECF No. 775 (Feb. 24, 2016 Trial Transcript, morning) at 77:25-80:20 (discussing a ledger that showed that a transaction had been completed in 2003 with Vinicio Reyes Sosa). Neither party pressed this issue at trial. Defendant did not make it a point of impeachment. The jury heard this testimony, assessed any inconsistencies, made credibility determinations, and reached their own conclusions.

Regardless, even assuming that the date of Mr. Reyes Sosa's arrest was clearly stated at trial, and that it was stated incorrectly, this would not have any impact on Defendant's case at this stage. Because Defendant has attached certain Guatemalan records to his latest set of motions, the Court assumes that defense counsel intended to move for a new trial on the grounds of newly discovered evidence. Assuming that the Court interprets Defendant's pleading correctly, the Court finds that such a motion would fail for a number of reasons. "To obtain a new trial because of newly discovered evidence (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal." *Thompson v. United States*, 188 F.2d 652, 653 (D.C. Cir. 1951). None of these requirements are met here. There is no indication that this evidence was newly discovered after trial. To the extent it was, Defendant certainly did not act diligently, as these documents appear to be publicly available records. And the import of this evidence would be solely to impeach the trial testimony of Government witnesses.

Most importantly, the evidence is immaterial—certainly not likely to produce an acquittal.  Defendant represents that Mr. Reyes Sosa's arrest related to the motivation or need of the Otto Herrera DTO to enlist Defendant in the drug importation conspiracy.  Defendant seems to argue that if he can show that the Otto Herrera DTO was wrong, and that Mr. Reyes Sosa had *not* actually been arrested, this would demonstrate that Defendant did not actually participate in the conspiracy.  He argues: "I am not the person that is identified as in the investigation done by Detective Fraga.  I am not that person that he's referring to.  There was never an opening in the Otto Herrera Organization that needed to be filled.  That was already being done by Vinicio Reyes Sosa, who was the one who did that for the organization."  Tr. 40:8-23.

This ploy is clearly meritless.  Even if the Government witnesses were wrong about whether Mr. Reyes Sosa had been arrested, and they did not in fact need to enlist the services of Defendant to take Mr. Reyes Sosa's place, the Government still presented overwhelming evidence that Defendant's services were *in fact* enlisted, and that he did *in fact* participate in the conspiracy.  The Reyes Sosa issue was of very little importance to the trial.  Completely independent of that issue and Special Agent Fraga's affidavit, there was substantial evidence presented at trial, including in-court identifications by numerous co-conspirators, that established that Defendant was in fact a participant in the drug importation conspiracy described in the Indictment.

For the reasons laid out above, Defendant's argument about the testimony at trial related to Vinicio Reyes Sosa is rejected.  This argument has no effect on Defendant's sentencing and does not entitle him to a new trial, judgment of acquittal or release.

**C.  Co-Conspirators Arrested After 2009**

Defendant also takes issue with the fact that the Government continued its investigation and collection of evidence against Defendant after the operative Indictment was returned in 2009.  Defendant noted in court that several of his co-conspirators who testified against him were arrested and began cooperating with the Government after 2009.  Tr. 25:15-26:6.  He asked, "So why is it that when they pled guilty, when they had accepted responsibility for their offenses, they did not provide this testimony? Why is it that the statements made against me were made by them a few days before they came to testify?"  Tr. 28:2-7.

This argument lacks merit.  The Government is entitled to continue its investigation after an indictment has been returned.  There is no reason why witnesses who are arrested after that time cannot testify at trial.  There is also no requirement that witnesses who plead guilty provide information against Defendant as part of their guilty pleas.  The purpose of the statement of facts accompanying a plea is to ensure a minimum factual basis to support that particular individual's guilty plea.  There is accordingly no reason why those individuals' pleas would necessarily include information about Defendant.  In some instances, as the Government points out, the crimes associated with those pleas had no relation to Defendant at all.  There is nothing improper about those witnesses deciding to cooperate with the Government by providing information about Defendant and testifying at Defendant's trial at a later time.

Accordingly, Defendant's arguments about the testimony of co-conspirators arrested after 2009 is rejected.  This argument has no effect on Defendant's sentencing and does not entitle him to a new trial, judgment of acquittal or release.

**D.  Defendant's Possession of Firearms**

Defendant argues that his use of firearms should not be considered in his sentencing because a court in Guatemala allegedly determined that he "had no responsibility" in a criminal case related to weapons.  Def.'s First Mot., Ex. 4 at 5.  Defendant is concerned that by applying an enhancement to his sentence in this case based on his use of firearms, despite his alleged acquittal in Guatemala, he is being "judged twice for the same fact."  *Id.*  Defendant also claimed at the November 1, 2017 hearing that the Court had previously told him that his use of weapons would not be held against him at sentencing.

The Court has already explained why the record amply supports a sentencing enhancement for the possession of firearms in this case.  Tr. 11:3-18.  As the Court explained, the evidence at trial showed that Defendant was arrested in 1999 possessing firearms used to protect his drug trafficking operations.  The evidence at trial also indicated that Defendant and his workers were heavily armed during various drug trafficking transactions.  In other words, the evidence showed that over a period of many years Defendant engaged in drug trafficking activities and possessed firearms in order to support those activities.  Under such circumstances, the sentencing enhancement for possession of firearms is clearly proper.  Whether or not Defendant was convicted of a firearms-related offense in Guatemala, as opposed to being merely arrested, is completely irrelevant to this finding.  Defendant is not being "judged twice for the same fact."  The Court can consider evidence of Defendant's possession of firearms in crafting Defendant's sentence in this case despite his not being convicted in a separate matter in Guatemala.  *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence").

Moreover, the Court has reviewed its prior orders and concludes that it never stated that Defendant's involvement with weapons would not be held against him at sentencing. Finally, to the extent Defendant is yet again intending to challenge the admissibility of firearm evidence at his trial, the Court has already explained its reasoning for allowing the Government to present evidence regarding Defendant's arrest for possession of firearms in both pre- and post-trial Orders. *See* June 2, 2017 Mem. Op. and Order, ECF No. 931 ("June 2 Op.") at 20-23; Oct. 30, 2015 Mem. Op. and Order, ECF Nos. 644, 645. As the Court most recently explained:

> Next, Defendant Eliu also argues that the Court erred by finding that evidence of his "arrest in February 1999 where he possessed multiple firearms and weapons, including AK-47s, M-16s, and submachine guns" was admissible evidence of uncharged acts—the use and possession of firearms—"intrinsic" to the charged drug trafficking conspiracy. ELC Mot. at 15- 23. Defendant argues that this finding was inherently erroneous because the government did not specify in its pretrial papers the precise time frame it intended to prove the Defendants' use and possession of the firearms, and accordingly the Court could not have been sure that these acts overlapped in time with the charged conspiracy. *Id.*

> Under Federal Rule of Evidence 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)-(2). However, evidence that is "intrinsic" to the crime charged is not subject to the limitations of Rule 404(b) because, by its very nature, it does not involve "other crimes, wrongs, or acts," and thus there is no concern that it might be used as improper character evidence. *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000). The *Bowie* Court recognized that at least two types of evidence may be properly considered "intrinsic," that is, not subject to Rule 404(b): (1) evidence "of an act that is part of the charged offense"; and (2) evidence of "some uncharged acts performed contemporaneously with the charged crime . . . [that] facilitate the commission of the charged crime." *Id.* at 929. Where the crime charged is conspiracy, evidence closely related to the conspiracy alleged in the indictment is admissible as intrinsic evidence. *See United States v. Badru*, 97 F.3d 1471, 1475 (D.C. Cir.

1996) (quoting 22 CHARLES A. WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5239, at 450 (1978)) ("In cases where the incident offered is part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an 'other' crime. The evidence is offered as direct evidence of the fact in issue."). By contrast, where evidence of prior acts relates to actions substantially different from the goals of the conspiracy charged, and occurs prior to the commencement of the conspiracy period, that evidence is better analyzed as falling under the purview of Rule 404(b). *United States v. Larrahondo*, 885 F. Supp. 2d 209, 227-28 (D.D.C. 2012); *United States v. Morrow*, Crim. No. 04–355, 2005 WL 3159572, at *8 (D.D.C. 2005).

As indicated in Defendant's papers, the Court already addressed this issue in an October 30, 2015 Memorandum Opinion and Order, ECF Nos. 644, 645. The Court held that Defendant Eliu's arrest "constitute[d] direct evidence of the manner and means used by Defendant Eliu to facilitate the narcotics conspiracy, and demonstrate[d] his role as a leader in the alleged conspiracy." ECF No. 645 at 13. The Court explained that "Defendants' alleged possession and use of weapons, as well as their reliance on heavily-armed security, are part and parcel to the alleged drug trafficking operation and constitute contemporaneous conduct designed to facilitate and advance the goals of the charged conspiracy." *Id.* It accordingly found that the arrest was admissible intrinsic evidence. The Court will not repeat the analysis in its October 30, 2015 Memorandum Opinion here. The Court instead incorporates it and make it a part of this Memorandum Opinion.

Defendant argues that the Court's analysis and holding in its October 30, 2015 Memorandum Opinion and Order were inherently erroneous because the Court could not have found that this "other act" evidence was contemporaneous with the charge conspiracy. This argument is meritless. The Court noted in its earlier Memorandum Opinion that "the Government ha[d] not specified the timeframe during which the Government intends to prove the Defendants' use and possession of firearms, as well as Defendants' use of heavily-armed security." *Id.* Therefore, the Court expressly limited its holding to evidence within the appropriate time frame, stating that "to the extent that the Government intends to introduce evidence of Defendants' use of firearms and security outside the time frame of the alleged conspiracy, such evidence shall not be considered evidence intrinsic to the charged conspiracy, but shall be conditionally admitted under Rule 404(b)." *Id.* Moreover, this timing issue was certainly not a problem with respect to Defendant's

> 1999 arrest—which appears to be the focus of Defendant's argument here—because by its very nature the 1999 arrest was contemporaneous with the charged conspiracy, which lasted from 1996 to 2009. Defendant fails to point to any other evidence presented at trial regarding the use or possession of firearms that fell outside the relevant time period. It appears to the Court that all such evidence was contemporaneous and intertwined with the conspiracy and that it was accordingly appropriately admitted.
>
> Because the evidence was intrinsic, no Rule 404(b) analysis was required. The arrest was also not subject to exclusion under Rule 403 because its probative value—"direct evidence of the manner and means used by Defendant Eliu to facilitate the narcotics conspiracy," ECF No. 645 at 13—was not substantially outweighed by any danger of unfair prejudice, confusion of the issues, misleading of the jury, undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403. For these reasons, the Court rejects Defendant's argument that it was an error to admit evidence of his 1999 arrest.

June 2 Op. at 20-23. Defendant has not raised any grounds for reconsidering this decision.

Accordingly, Defendant's arguments about his use of firearms is rejected. The sentencing enhancement for possession of firearms is appropriate, and Defendant is not entitled to a new trial, judgment of acquittal or release.

## E.  Organizer or Leader

Defendant also argues that the Court should not apply an enhancement to his sentence for his having been an organizer or leader of a drug conspiracy with five or more participants. U.S.S.G. 3B1.1(a). Defendant claims that he was not a "leader" of the charged conspiracy. Def.'s First Mot., Ex. 4 at 4. Defendant defines the term "leader" as "people capable of guiding and influencing other people or groups of people, which is also recognized as such." *Id.* He argues that he does not qualify under this definition.

Defendant's definition of leader is completely irrelevant to the Court's analysis under the sentencing guidelines. The Court is instead instructed by the Sentencing Guidelines themselves

and the commentary thereto.  That commentary instructs that "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. 3B1.1, n.4.  It also instructs that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  *Id.*

The Court has already explained why the record supports a sentencing enhancement for Defendant's leadership role in the conspiracy.  Tr. 5:11-7:12.  As the Court has explained, there were clearly at least five participants in Defendant's conspiracy, including his father, two brothers, business associates (Otto Herrera, Sebastiana Cotton, David Andrade, Marllory Chacon, etc.) and numerous workers who reported to the Defendant (Guasha, Luisito, Rigo Salguero, etc.).  Defendant supervised and had authority over those workers, and was seen by his co-conspirators as the leader and point-person in control of cocaine shipments through his property.  Defendant's father, who was initially very involved in the conspiracy, eventually advised Otto Herrera to deal directly with Defendant as opposed to others within the conspiracy because Defendant was smarter than his co-conspirators and could make certain that things were done correctly.  Defendant also engaged in high-level negotiations and decision-making about the direction and investments of the conspiracy.  He qualifies as a leader or organizer under the sentencing guidelines.

Accordingly, Defendant's arguments about his role as a leader are rejected.  The sentencing enhancement for leaders and organizers is appropriate, and Defendant is not entitled to a new trial, judgment of acquittal or release.

## F.  Defendant's Decision Not to Testify

Next, Defendant argues that he was not allowed to testify at trial.  Tr. 24:12.  This is false.

During trial, the Court had the following discussion with the Defendant:

> **The Court:** I want to make sure that you understand that you do have a constitutional right to testify, if you want to. And obviously you should have a conversation with your lawyer and seek his advice, but I want you to understand that whether or not you testify is your decision. It's not -- you get your lawyer's advice, but your lawyer doesn't tell you what to do. You make this decision on your own. No one can prevent you from testifying, if that's what you want to do, and no one can force you to testify, if you don't want to. And if you decide not to testify, then I will instruct the jury at the end of the trial that you have an absolute right not to testify, and that the jury may not and cannot draw any inference of guilt because you have not -- because you've decided not to testify. All right. Have you had enough time to think about this and consult with your lawyer?

> **Defendant:** Yes, I have, Your Honor. We have spoken with the attorney.

> **The Court:** All right. And Mr. Eliu Lorenzana Cordon, do you want to testify in this case, or do you not want to testify in this case?

> **Defendant:** Your Honor, I have decided to not testify. The one who will speak will be attorney.

ECF No. 797 (March 15, 2016 Trial Transcript, afternoon) at 58:19-59:12.  This discussion was not "ambiguous," as Defendant now argues.  It was entirely clear.  Defendant was apprised of his right to testify and decided not to do so.  Defendant's argument that he was not given the opportunity to testify is accordingly meritless.  It has no effect on Defendant's sentencing and does not entitle him to a new trial, judgment of acquittal or release.

## G.  Sufficiency of Evidence of Intent

The Government speculates that Defendant's citation to certain portions of the record and his related assertions of innocence may have been intended as a renewed challenge to the sufficiency of the evidence of Defendant's intent to import cocaine into the United States.

Certain portions of a personal statement Defendant has submitted to the Court support this assumption.  Def.'s First Mot., Ex. 4 at 13-14 ("how could it be said that my person imported drugs into the United States?").  The Court has already considered and rejected the argument that there was insufficient evidence to convict Defendant for intentionally importing cocaine into the United States.  June 2 Op. at 16-20.  In the interest of completeness, the Court includes that discussion here:

> Next, Defendant Eliu argues that the government did not present sufficient evidence that he imported cocaine into the United States with the requisite knowledge or intent. Specifically, Defendant challenges the evidence of his knowledge that the cocaine was destined for the United States, arguing that "the government failed to prove that he possessed knowledge and specific intent to be a co-conspirator in crimes to be committed in the United States." ELC Mot. at 5 (emphasis in original). As the government acknowledges, it was required to demonstrate at trial that Defendant had "actual, not constructive, knowledge" that the cocaine was to be imported into the United States. *United States v. Chan Chun-Yin*, 958 F.2d 440, 443 (D.C. Cir. 1992).
>
> Defendant's argument is unavailing. "Challenging a jury verdict for insufficient evidence carries with it an 'exceedingly heavy burden.'" *United States v. Vega*, 826 F.3d 514, 522 (D.C. Cir. 2016) (quoting *United States v. Booker*, 436 F.3d 238, 241 (D.C. Cir. 2006)). "To prevail, Defendant[ ] must convince the court that no 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Stadd*, 636 F.3d 630, 636 (D.C. Cir. 2011)). The Court "review[s] sufficiency-of-the-evidence claims 'in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" *Id.* (quoting *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005)); *see also United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (sufficiency of evidence challenge "is limited to determining 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'") (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).

In this case, the government presented more than sufficient evidence that Defendant had actual knowledge that the cocaine was to be imported into the United States. First, the jury heard testimony from a co-conspirator that she expressly told Defendant that the cocaine was being sold in the United States. ECF No. 786 (March 7, 2016 Trial Transcript, afternoon) at 21 ("I would always tell [Defendant Eliu] that they wanted good quality, otherwise they would return it," identifying "they" as "the bosses in United States"); *id.* ("Q. So did Eliu know where the cocaine was going? A. Yes."); *id.* at 23 ("Q. And would you tell Eliu who the clients were? A. Yes. Q. And who were the clients? A. They were U.S. clients."); *id.* at 39 ("Lucas would sell the drugs to the Americans, and I knew it. And I told that to Eliu, that it was being sold to the Americans."). The jury also heard testimony that Eliu himself identified the purchasers of the cocaine as Americans. ECF No. 786 at 34 ("Q. And when Eliu said that you would have to keep the gringos happy, who was he referring to? A. The Americans, the ones buying the drugs."); *id.* at 40 ("A. So Don Eliu called me and said, 'Jefe, so that you and I don't have any problems, you should call your clients, the gringos, and have them pack the money well because it got wet.' Q. And who was he referring to when he said 'gringos'? A. The Americans because that's what we called them over there."). Additionally, the jury heard testimony from another co-conspirator that he had discussions with Eliu in which the two talked about how Eliu's customers located along Mexico's border with the United States were delayed in paying for cocaine because "[i]t was going to take a while to come back because they were going to take it north." ECF No. 784 (March 3, 2016 Trial Transcript, afternoon) at 69.

Moreover, to complement this direct evidence, the government also introduced a substantial amount of circumstantial evidence from which a jury could easily conclude that Defendant knew that the cocaine was intended to be imported into the United States. First, evidence was presented that showed that Defendants were selling cocaine to Mexican customers at the Mexican border with the United States, and that Defendants were aware that their coconspirators similarly sold cocaine to cartels in Mexico. ECF No. 785 (March 3, 2017 Trial Transcript, morning) at 37 (discussing the sale of cocaine to customers on the border of Mexico and the United States); ECF No. 781 (March 2, 2017 Trial Transcript, morning) at 63 ("He [Eliu] knew that the drug was handed to the Sinaloa cartel" . . . "I would say, you know, 750 kilos out of the 1500 you have are going straight to Mexico"). A reasonable juror could certainly have inferred that this effort to sell their drugs north to Mexican customers evinced a knowledge that those drugs were destined for the United States. In support of this inference, the jury heard expert

testimony that nearly all of the cocaine moving through Central American in the late 1990's and early 2000's—90%—was destined for the United States. ECF No. 791 (March 9, 2016 Trial Testimony, afternoon) at 43; *United States v. Martinez*, 476 F.3d 961, 969 (D.C. Cir. 2007) (finding that evidence of defendant's intent and knowledge about the U.S. destination of cocaine was sufficient in part because similar "expert testimony suggest[ed] that a sophisticated drug trafficker like [defendant] would be well aware that drugs moving north on the PanAmerican Highway-as this shipment was-were destined for the United States."). The jury also heard evidence that Mexican purchasers of cocaine wanted the best price for their product, which was the price available in the United States. ECF No. 782 (March 2, 2016 Trial Transcript, afternoon) at 88 (testifying as to his opinion that the ultimate destination of Defendant's cocaine was the United States because "every Mexican buyer seeks for the ultimate best price in the market," which is "[t]he U.S. market").

Second, further cementing the inference that Defendant knew that his product was being sold in the United States, the jury heard testimony that the proceeds that came back to Defendant were in U.S. dollars. *See, e.g.*, ECF No. 786 at 29 ("Q. What currency would you pay Eliu Lorenzana in? A. Dollars. Q. U.S. dollars? A. Yes. Q. What is the reason that you paid in U.S. dollars? A. It was the Americans who were buying it."); ECF No. 796 (March 15, 2016 Trial Transcript, morning) at 29 (witness stating that she saw $10 million U.S. dollars at warehouse by Waldemar Lorenzana-Cordon's house); *id.* at 30-32 (describing being led to "where the U.S. dollars were kept," which the witness estimated totaled more than $20 million); ECF No. 781 at 30-31 ("That cocaine was paid, it was agreed to be paid in U.S. dollars."); ECF No. 785 at 32 ("Q. And what currency would you be paying in? A. U.S. dollars."). The jury could reasonably have inferred that Defendant knew that the proceeds from the cocaine were coming from sales in the United States based on the fact that he and his co-conspirators were paid in U.S. dollars. Multiple witnesses even expressly addressed this inference in their testimony. Most succinctly, one witness explained that "[i]f cocaine is being paid with dollars, it means that it's being sold in the United States." ECF No. 782 at 88; *see also* ECF No 796 ("Q. And where was the money coming from? A. From the United States. Q. And how do you know that? A. Well, first of all, the currency is U.S. dollars."). The inference becomes even more reasonable when supplemented with testimony that the U.S. dollar proceeds Defendants received were in small denominations, which tends to suggest that the money was derived from individual sales in the United States. ECF No. 796 at 31 (describing having seen $20

and $50 bills); ECF No. 784 at 76 ("Q. So based on your experience, can you explain why there are small denomination bills which are being generated for the purchase of that cocaine? A. Basically the small denominations, they come from the streets of the United States.").

Finally, the Court notes that Defendant's co-conspirators themselves testified that they believed the cocaine purchased was destined for the United States. ECF No. 782 at 88; ECF No. 786 at 39; ECF No. 788 at 28-29; ECF No. 796 at 28. It was reasonable for the jury to assume that Defendant shared this apparently common knowledge about the destination of the cocaine. From all of the above circumstantial evidence—in addition to direct evidence that Defendant knew the cocaine was being sold in the United States—the jury could reasonably have inferred that these facts were known to Defendant, whom the evidence at trial demonstrated was a fairly major player in the drug trafficking world, deeply involved with the movement of cocaine in immense quantities for many years. *Martinez*, 476 F.3d at 969 ("Given Martinez's supervisory role, it strains credulity to suggest he did not know the United States was the ultimate destination."). For the above reasons, the Court rejects Defendant's argument that the evidence of his intent to import cocaine into the United States was insufficient.

June 2 Op. at 16-20. Defendant has not raised any grounds for reconsidering this decision.

Accordingly, any argument Defendant intended to raise about the sufficiency of the evidence that he intentionally imported cocaine into the United States is rejected. This argument has no effect on Defendant's sentencing and does not entitle him to a new trial, judgment of acquittal or release.

## H.  Violation of Defendant's Extradition Rights

Defendant argues that his conviction violated his extradition rights and the doctrine of specialty because he was tried and convicted for a crime other than that for which he was extradited. Def.'s First Mot., Ex. 4 at 4. The Court has already rejected this argument and explained its reasoning. As the Court explained:

Next, both Defendants claim that their convictions violated their extradition rights and the doctrine of specialty because they were

19

allegedly tried and convicted for a crime other than that for which they were extradited. ELC Mot. at 29-33; WLC Mot. at 17-18. The doctrine of specialty "provides that 'once extradited, a person can be prosecuted only for those charges on which he was extradited.'" *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 206 (D.C. Cir. 2013) (quoting United States v. Sensi, 879 F.2d 888, 892 (D.C. Cir. 1989). Defendants argue that because the government presented evidence of a drug trafficking conspiracy or conspiracies beyond the bounds of the conspiracy outlined in the indictment, Defendants were "in effect" tried for a conspiracy that was different than the one for which they were extradited. WLC Mot. at 18; ELC Mot. at 32-33. The Court disagrees.

The parties first dispute whether Defendants have standing to raise this argument at all. The government contends that only the extraditing state, in this case Guatemala, has such standing. The D.C. Circuit in *Lopesierra-Gutierrez* recently recognized the conflicting authority on this issue. 708 F.3d at 206. That court declined to resolve the conflict and moved on to determine the merits of the doctrine of specialty argument raised in that case instead. *Id.* Because it is clear to the Court that Defendants' doctrine of specialty argument fails on the merits, the Court will follow the Court of Appeals' lead in this case and proceed to the merits. *See Kaiser v. Rutherford*, 827 F. Supp. 832, 835 (D.D.C. 1993) (assuming defendant had standing to raise the doctrine of specialty arguendo, and proceeding to the merits of defendant's argument).

On the merits, Defendants' argument fails for the same reason that Defendants' constructive amendment and multiple conspiracy arguments failed: Defendants were convicted for a single conspiracy that fits within the charges in the indictment for which Defendants were extradited. *See* WLC Reply at 13 (conceding that "should the Court agree completely with the government that alleged trafficking with [co-conspirators unrelated to the Otto Herrera DTO] was squarely within the terms of the actual indictment, Defendant's claim under the Rule of Specificity would fail"). The indictment charged Defendants with conspiring with individuals associated with the Otto Herrera DTO and also with "other co-conspirators, both known and unknown" to the grand jury, from 1996 to 2009. Those were the charges for which the government of Guatemala decided to grant extradition, and they were the charges for which Defendants faced trial.

The Court also notes that the extradition documents Defendants have attached to their post-trial briefs do not support their argument that the government of Guatemala intended to only extradite

Defendants for a conspiracy limited to the Otto Herrera DTO ending in 2003. The affidavit of Stephen Fraga in support of request for extradition states that "members of the Lorenzana organization did not work exclusively with members of the Herrera organization" and then discusses criminal conduct of Defendant Eliu as late as 2006. ELC Mot., Ex. 1 at 11-12. The affidavit of Michael Lang in support of extraditing Defendant Waldemar similarly states that the indictment "charges criminal violations occurring from March 1996 until April 2, 2009." WLC Reply, Appendix B at ¶ 18. And the Guatemalan extradition order relied on by Defendant Eliu describes the criminal conduct at issue as occurring "from the end of 1999 up until *at least* 2003," and also describes criminal conduct occurring in 2005 and 2006. ELC Mot., Ex. 3 at 8- 9, 11. The inclusion of conduct that occurred after 2003 in these documents is in line with the scope of the charges in the indictment for which Defendants were extradited and convicted, which exceeds the Defendants' involvement with the Otto Herrera DTO. They accordingly buttress the Court's conclusion that no violation of the doctrine of specialty has occurred.

Finally, to the extent Defendants' argument is that evidence was presented at trial relating to conduct other than the charged conspiracy, ELC Mot. at 32-33 (arguing that a "violation of the rule of specialty" occurred because the Court "allowed evidence of conspiracies that occurred after 2003") (emphasis added); WLC Mot. at 18 (violation occurred "when the government presented evidence of alleged drug trafficking with coconspirators not associated with the Herrera DTO") (emphasis added), even if true, this argument misses the mark because "the doctrine of specialty governs prosecutions, not evidence," *Lopesierra-Gutierrez*, 708 F.3d at 206. "The doctrine has nothing to do with the 'scope of proof admissible into evidence in the judicial forum of the requisitioning state.'" *United States v. Kember*, 685 F.2d 451, 458 (D.C. Cir. 1982) (quoting *United States v. Flores*, 538 F.2d 939, 944 (2d Cir. 1976)). Accordingly, the use of evidence of conduct other than the charged conspiracy to prove the charged conspiracy—even if it had occurred—would not have constituted a violation of the doctrine of specialty. For the above reasons, the Court concludes that Defendants' doctrine of specialty arguments fail.

June 2 Op at 13-16.  Defendant has not raised any grounds for reconsidering this decision.

Accordingly, Defendant's argument about his extradition rights is rejected. This argument has no effect on Defendant's sentencing and does not entitle him to a new trial, judgment of acquittal or release.

## I. Bias and Multiple Conspiracies

Defendant argues that "giving this honorable court all respect it is due, it is difficult to understand how the court could hear Otto Herrera-Garcia's plea and sentencing as early as 2011, the plea and sentencing of Guillermo Herrera-Garcia as early as 2011, the plea and sentencing of Walter Montejo-Merida as early as 2012, the plea and sentence of Byron Linares in 2015, Rule 35 motions and motions pursuant to 3553(e), that this honorable court could remain unbiased and rule as matter of law that the facts of this case did create a multiple conspiracy question for the jury." Def.'s Second Mot. at 4.

The meaning of this argument is difficult to discern. To the extent Defendant argues that the Court is biased against Defendant, and this argument was intended to constitute a motion for recusal, that motion would be denied. Defendant has not suggested any reason at all to conclude that the Court would be biased or prejudiced against him.

To the extent Defendant means to challenge, once again, the Court's rejection of Defendant's multiple conspiracies argument, the Court has already explained its reasoning for rejecting that argument in two separate Orders. *See* June 2 Op. at 5-9; March 16, 2016 Mem. Op. and Order, ECF No. 762. As the Court most recently explained:

> The Court begins its analysis with Defendants' arguments regarding whether the evidence at trial demonstrated a single conspiracy or multiple conspiracies. Defendants both challenge the Court's denial of Defendants' joint request for a jury instruction on multiple conspiracies. WLC Mot. at 18-20; ELC Reply at 7-8. Defendant Eliu in particular also goes a step further and argues that there was insufficient evidence to support the existence of a single conspiracy and that accordingly there was a variance between the conspiracy

charged in the indictment and the evidence at trial. ELC Mot. at 23-29. The standards for these arguments are somewhat distinct. With respect to Defendants' challenge to the Court's denial of a multiple conspiracy jury instruction, "[i]f the record support[ed] the existence of multiple conspiracies, the jury [should have been] instructed to consider them." *United States v. Brockenborrugh*, 575 F.3d 726, 737 (D.C. Cir. 2009); *see also United States v. Graham*, 83 F.3d 1466, 1472 (D.C. Cir. 1996) ("Our rejection of appellants' insufficiency claim does not obviate the need to address this issue, for if record evidence supports the existence of multiple conspiracies, the district court should have so instructed the jury."). With respect to Defendant Eliu's insufficiency argument on the other hand, "[t]he verdict must be upheld if the evidence adequately support[ed] a finding that a single conspiracy existed," and the Court "[v]iew[s] the evidence in the light most favorable to the government." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988). Regardless of this distinction, both of these arguments fail because the evidence at trial demonstrated a single conspiracy, and did not support the existence of multiple conspiracies.

As Defendant Waldemar acknowledges, the Court already considered and rejected Defendants' argument that the evidence demonstrated multiple conspiracies in a "detailed Memorandum Opinion." WLC Mot. at 18. On March 16, 2016, the Court issued a Memorandum Opinion and Order denying Defendants' Joint Defense Motion for Multiple Conspiracy Instruction explaining why it found that the record evidence did not support the existence of multiple conspiracies. *See* Memorandum Opinion and Order (March 16, 2016), ECF No. 762. The Court will not repeat that analysis here, but instead reaffirms it and incorporates it in full such that it is a part of this Memorandum Opinion. The Court has reviewed all of the arguments in the parties' post-trial briefs and has also gone back and reviewed the relevant portions of the record. The Court has in particular reviewed the portions of the record cited by the government that indicate that the evidence at trial showed that the conspirators shared a common goal, were interdependent, and overlapped with each other to at least some degree. *See Brockenborrugh*, 575 F.3d at 737 ("Whether a course of conduct should be classified as a single conspiracy or divided into multiple conspiracies depends on whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the plan."). For the reasons set forth in the Court's March 16, 2016 Memorandum Opinion and Order, the Court reiterates that the evidence was sufficient to demonstrate the existence of a single conspiracy, and did not support the existence of multiple conspiracies.

The Court also now adds that Defendants' multiple conspiracy arguments fail for the additional reason that Defendants have not demonstrated any prejudice. A variance between single and multiple conspiracies can only be grounds for reversal if it "substantially prejudices the defendant, as, for example, if the jury were 'substantially likely to transfer evidence from one conspiracy to a defendant involved in another.'" *United States v. Gatling*, 96 F.3d 1511, 1519 (D.C. Cir. 1996) (quoting Tarantino, 846 F.2d at 1391). "Substantial prejudice occurs when multiple defendants are charged with a large and complex conspiracy and spillover prejudice confuses the jurors." *United States v. Mathis*, 216 F.3d 18, 25 (D.C. Cir. 2000). Similarly, failure to give a multiple conspiracy instruction is grounds for reversal only if the failure was prejudicial. *United States v. Cross*, 766 F.3d 1, 4 (D.C. Cir. 2013).

Assuming for the purposes of Defendants' arguments that the evidence at trial had demonstrated multiple conspiracies, Defendants have not suggested any plausible way in which this prejudiced them. The Court is not persuaded by Defendants' conclusory statements that they were prejudiced, see ELC Mot. at 28, because even if the Court were to accept that there were multiple conspiracies at play, the evidence certainly did not demonstrate any conspiracies that did not involve the Defendants. Accordingly, the danger of "spillover prejudice" to Defendants from one conspiracy to another is muted. *See United States v. Gaviria*, 116 F.3d 1498, 1533 (D.C. Cir. 1997) ("Naranjo played a role in all aspects of the conspiracy. Accordingly, even if there were three separate conspiracies, Naranjo would have to be deemed a member of each and could not, therefore, have been the victim of any spillover prejudice."). Moreover, the Court agrees with the government that the danger of confusing the jury in this sense was very minimal given that there were only two Defendants at issue in this case. *Id.* (holding that "[t]he risk of 'spillover prejudice,' which may occur when a jury imputes evidence from one conspiracy to a defendant involved in another conspiracy, is less likely the fewer the defendants" and finding no such prejudice had occurred because "[o]nly four defendants were tried in this case."). Accordingly, for the independent reason that Defendants have not demonstrated prejudice, their multiple conspiracy arguments fail.

Finally, the Court pauses to address two arguments raised by Defendant Waldemar in his request that the Court reconsider this decision. First, Defendant contends that the government conceded that there were multiple conspiracies at issue in its closing argument. Having presided over the presentation of that argument and having

24

reviewed the transcript carefully, the Court finds no merit in this contention. In its closing argument, the government noted the fact that certain witnesses were from different places than, and did not have relationships with, other witnesses. But the government did not suggest, let alone concede, that there were multiple conspiracies in the legal sense relevant to Defendants' argument. Instead, the government was merely noting that the testimony of these cooperating witnesses was reliable because they all testified consistently about the conspiracy despite having independent bases for their knowledge.

Second, Defendant Waldemar contends that the Court should reconsider its ruling because it "relied heavily on the assertion that the Lorenzana brothers were the leaders" of a conspiracy, whereas in reality Otto Herrera was the conspiracy's leader. This argument is also not persuasive. As an initial matter, even if Defendants were not the "leaders" of the conspiracy, it is unclear why that necessarily means that the evidence demonstrated multiple conspiracies. Moreover, the Court simply disagrees that the evidence presented at trial demonstrated that Otto Herrera was the leader of the conspiracy at issue. Otto Herrera may have been a more significant or well-known drug trafficker in a general sense, but that does not mean that he was necessarily the leader of the particular conspiracy government presented at trial, which focused on the Defendants and was different than the Otto Herrera Drug Trafficking Organization ("DTO"). Finally, regardless of Otto Herrera's purported leadership, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *United States v. Bras*, 483 F.3d 103, 113-14 (D.C. Cir. 2007) (internal quotation omitted). For the above reasons, the Court reaffirms its March 16, 2016 Memorandum Opinion and Order, incorporates into this Memorandum Opinion and Order as though stated in full, and rejects Defendants' multiple conspiracy arguments.

June 2 Op. at 5-9.[3]  Defendant has not raised any persuasive grounds for reconsidering that decision. Defendant does appear to challenge the Court's conclusion that his multiple conspiracy argument failed because he did not demonstrate prejudice, by arguing that "the Guatemalan government was improperly persuaded to remove Defendant from his native land, his friends, his

---

[3] Although this Opinion mentioned certain arguments raised by Defendant Waldemar Lorenzana-Cordon in particular, it also addressed Defendant Eliu's multiple conspiracy arguments.

family and his way of life and send him to the United States, a foreign land whose language he does not speak and whose rules he does not understand, in order to stand trial for an American crime carrying a potential life sentence."  Def.'s Second Mot. at 4.  But this is not the type of "prejudice" caused by a variance between a single and multiple conspiracy or by the denial of a multiple conspiracy jury instruction that the Court was referring to in its June 2, 2017 Memorandum Opinion and Order.  The alleged prejudice Defendant refers to now appears instead to be generalized grievances about his extradition from Guatemala, a completely different issue.

Accordingly, any arguments Defendant is attempting to raise with respect to bias or multiple conspiracies are rejected.  These arguments have no effect on Defendant's sentencing and do not entitle him to a new trial, judgment of acquittal or release.

## J.   Use of Aircraft

Finally, the Court takes this opportunity to address an issue that has been raised about Defendant's use of aircraft.  The Presentence Investigation Report prepared for Defendant recommends a two level increase in the offense level computation under USSG § 2D1.1(b) because "[t]he co-conspirators used an aircraft other than a regularly scheduled commercial air carrier to import controlled substances."  Section 2D1.1(b) states that a two level increase is authorized "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which . . . an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance."

This increase is appropriately applied in this case.  Although the record does not indicate that Defendants' DTO used an aircraft to accomplish the final stage of importation—*i.e.*, the actual crossing of the United States border with cocaine—the record does show that for years the

DTO used aircraft as part of an overall scheme to import cocaine into this country.  Importing controlled substances is often an intricate process involving multiple stages, and a plain reading of section 2D1.1(b) does not indicate that the increase applies only if an aircraft is used in the *final* border crossing stage of that process.  Where, as here, Defendants established and repeatedly used a regular scheme for importing cocaine into the United States that incorporated the use of non-commercial aircraft, the two level increase set forth in section 2D1.1(b) is appropriate.

The Court is not aware of any case law from this Circuit addressing this issue.  The parties have presented the Court with three cases from other Circuits which they contend are relevant.  The first case is *United States v. Chastain*, 198 F.3d 1338 (11th Cir. 1999), in which the Eleventh Circuit concluded that section 2D1.1(b) did not apply in an instance where the defendants had merely *intended* to import controlled substances into the United States by use of an airplane.  The court held that the enhancement was not applicable under such circumstances because "the language of the guideline clearly contemplates a completed event, an actual importation," and "[t]hat did not occur in [that] case." *Id.* at 1353.  *Chastain* is of little help to the Court in this case.  Unlike in *Chastain*, the evidence presented at trial in this case clearly indicated that the Defendants successfully imported considerable amounts of controlled substances into the United States using non-commercial aircraft.

More relevant are *United States v. Iacullo* and *United States v. Joelson*.  In *Iacullo*, the Eleventh Circuit affirmed a district court's application of section 2D1.1(b) where "a private plane was used several times to pick up cocaine in Colombia and fly it to the Bahamas, while the cocaine was en route to this country," because under these circumstances "it is clear that a private plane 'was used,' within the meaning of § 2D1.1(b)(2)(A), during the importation

scheme, of which [defendant] was an active participant." *United States v. Iacullo*, 140 F. App'x 94, 102 (11th Cir. 2005). In *Joelson*, the Ninth Circuit took the opposite position. In that case, the court vacated a district court's application of the enhancement where a private plane flew cocaine to Guatemala, but a commercial air carrier was used to actually bring the drugs across the American border. *United States v. Joelson*, 7 F.3d 174, 180 (9th Cir. 1993).

These two cases are irreconcilable. Ultimately, the Court finds the Eleventh Circuit's interpretation of section 2D1.1(b) in *Iacullo* more convincing because it better reflects the plain meaning of the text of the guideline. As stated above, section 2D1.1(b) authorizes an increase "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which . . . an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance." The Ninth Circuit's narrow interpretation, for which Defendant argues, is not required by the plain meaning of this text. Where, as here, drugs are conveyed by non-commercial aircraft as part of an importation scheme while they are en route to the United States, the aircraft can be said to be "used" to import drugs even if it is not the ultimate conveyance of the drug across the American border.

In sum, the Court concludes that a two level increase in the offense level computation under section 2D1.1(b) is appropriate in this case.

Defendant has made some miscellaneous objections to the aircraft enhancement in his latest filing related to the location where the trafficked cocaine was stored before or after the use of the aircraft, and the time frame during which aircraft were used. These arguments are not persuasive. With respect to timing, Defendant concedes that there was testimony at trial that non-commercial aircraft were used from 2001 to 2003 (during the time of the conspiracy). *See* Def.'s Reply to the Gov.'s Response to Issues Raised at Sentencing, ECF No. 986, at 3. To the

extent Defendant argues that the drugs transported on those flights were stored at his co-conspirator's property prior to being imported into the United States, *id.*, this does not render the sentencing enhancement for use of a non-commercial aircraft inapplicable to Defendant. Regardless of *where* the drugs were stored, Defendant used a non-commercial aircraft as part of a scheme to import them into the United States.

***

For the reasons set forth above, it is, this 18th day of January, 2018, hereby

**ORDERED** that Defendant Eliu Lorenzana-Cordon's [975] Motion for New Trial and [982] Second Motion to Reconsider the Denial of Defendant's Revised Motion for a Judgment of Acquittal and for a New Trial or in the Alternative for the Release of the Defendant are **DENIED**.  It is further

**ORDERED** that the Court will set a new date for Defendant's sentencing by separate Order.

**SO ORDERED.**

                                                          /s/
                                                COLLEEN KOLLAR-KOTELLY
                                                United States District Judge