EXhibiT B

1   BY MR. LANG:

2      Q.   Mr. Linares, what, if any, effect did the Zona 14

3   seizure have on your drug trafficking activities with Eliu

4   Lorenzana-Cordon and Waldemar Lorenzana-Cordon?

5      A.   These house contained everything belonging to the Otto

6   Herrera organization, and the consequences, that is, when this

7   happened, was that the operations of the cocaine trafficking

8   ceased completely with the operations of the cocaine traffic

9   of the Otto Herrera organization.

10            MR. LANG:  Your Honor, just for the record, if I

11   might return to indicate that the defendant, excuse me, the

12   witness circled the checkbook in the north side of the photo

13   of Government's Evidence 43.

14            THE COURT:  All right.

15   BY MR. LANG:

16      Q.   Now, mr. Linares, you testified that the seizure ended

17   the trafficking operations for El Salvador; is that correct?

18      A.   That's correct.

19      Q.   What happened after the Zona 14 seizure.

20      A.   This was more or less in April and I was arrested on

21   May 22nd, 2003.

22      Q.   What were you arrested for?

23      A.   For the crime of use of false documents and for money

24   laundering.

25      Q.   Did you go to jail?





RECEIVED

MAY 16 2002

```
 1    A.    Yes, that's right.

 2    Q.    How long did you serve in prison?

 3    A.    Fifteen months, almost 16 months, approximately.

 4    Q.    What happened after these 16 months?

 5    A.    I recovered my freedom for a replacement measure.

 6    Q.    Can you describe what you mean by replacement measure?

 7    A.    A bond.

 8    Q.    And describe what you mean by the bond, what happened?

 9    A.    An appeals court gave me back my freedom after a bond

10    of 50,000 quetzales.

11    Q.    And once this bond was paid, what happened next?

12    A.    I left jail, I was released.

13    Q.    Once you left jail, what did you do?

14    A.    Twenty-four hours later I once again had another arrest

15    warrant.

16    Q.    How do you know that?

17    A.    Because it was shown on the media, television, papers.

18    Q.    What happened after you saw these media reports?

19    A.    I began hiding from the authorities.

20    Q.    What did you do to earn a living while you were hiding

21    from the authorities?

22    A.    I continued trafficking.

23    Q.    While you were hiding, did you continue to work with

24    Eliu Lorenzana-Cordon and Waldemar Lorenzana-Cordon to traffic

25    cocaine?
```

*(2)*

# Exhibit. C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case Number: 03-331 |
| | : | |
| ELIU ELIXANDER LORENZANA-CORDON | : | **AFFIDAVIT IN SUPPORT** |
| | : | **OF REQUEST FOR** |
| | : | **EXTRADITION** |
| | : | |

I, Stephen Fraga, being duly sworn, depose, and state:

1.    I am a citizen of the United States of America.

2.    I am a Special Agent with the Drug Enforcement Administration (hereinafter "DEA"), and have been so employed since 1991. I am currently assigned to the DEA Bilateral Investigations Unit in Chantilly, Virginia. As a Special Agent, I investigate criminal violations of the federal drug and controlled substance laws. I have personally conducted and participated in numerous narcotics investigations involving the illegal manufacturing, possession, sale, distribution and importation of a variety of controlled substances. I have amassed thousands of hours of experience in narcotics smuggling, and distribution investigations. As part of these investigations, I have debriefed dozens of defendants, witnesses, and informants who have had personal knowledge of major narcotics-trafficking organizations. In addition, I have successfully completed extensive training emphasizing narcotic investigations and enforcement.

3.    Prior to my employment as a Special Agent with the DEA, I was employed as a Special Agent of the United States Naval Investigative Service for approximately four and one half years.

4.    Based on my training and experience, I am familiar with the means and

**EXHIBIT**

_____1_____

1

methods that narcotics traffickers use to import illicit drugs, and I am familiar with the

support and assistance that narcotics organizations require to conduct their illegal

activities.  I am also knowledgeable about the criminal statutes of the United States,

particularly the federal narcotics statutes.

     5.     I am the agent assigned to this case, which involved an investigation of the

drug trafficking activities of ELIU ELIXANDER LORENZANA-CORDON, Byron

Linares, Guillermo Herrera-Garcia, Phanor Aristazabaleta, James Aristazabaleta, Rey

Aristazabaleta, Jose Fernando Aristazabaleta-Lenis, Ricardo Alfonso Bravo-Isaza,

Waldemar Lorenzana-Lima, Haroldo Geremias Lorenzana-Cordon, Waldemar

Lorenzana-Cordon, Jr., Carlos Andres Alvarenga-Mejia, Gonzalo Lopez-Cabrera, Ismael

Mario Zambada-Garcia and Jesus Reynaldo Zambada-Garcia and others associated with

Otto Herrera-Garcia and his drug trafficking organization.

     6.     I have been assigned to this investigation since 2006 and I am fully

familiar with the interviews of witnesses and confidential sources of information

(hereafter "confidential sources"), reports made by other DEA Special Agents and the

evidence in the case file.  Based on this information, I will summarize ELIU

ELIXANDER LINARES-CORDON's drug trafficking activities in the following

paragraphs.

## BACKGROUND

     7.     In approximately June of 1999, the DEA opened an investigation into the

Herrera-Garcia drug trafficking organization (hereafter "Herrera-Garcia organization").

The investigation identified Otto Herrera-Garcia as the leader of the organization, and

Otto Herrera's brother, Guillermo Vinicio Herrera-Garcia as the organization's logistical

coordinator. Over time, the Herrera-Garcia organization has been responsible for facilitating the smuggling of multi-ton shipments of cocaine through an international narcotics trafficking organization that transported cocaine from Colombia to El Salvador, Guatemala, and Mexico for importation to, and distribution in, the United States.

8.      Based upon this investigation, the DEA learned that the Herrera-Garcia organization essentially hired other drug trafficking organizations to assist the Herrera-Garcia organization with the transportation and storage of cocaine shipments from Colombia through Central America and on to Mexico for ultimate importation to and distribution in the United States. The investigation identified one of these drug trafficking organizations as the Lorenzana drug trafficking organization (hereafter "Lorenzana organization"), a narcotics trafficking organization operating out of Guatemala which is a transshipment point for drug shipments that originate in South America that are destined for the United States.

9.      The information contained in the following paragraphs shows that the members of the Lorenzana organization warehoused drugs once they arrived in Guatemala and facilitated the transportation of the drugs into and through Guatemala. The investigation also revealed that ELIU ELIXANDER LORENZANA-CORDON was a high ranking member of the Lorenzana family and was responsible for the coordination and receipt of drug shipments and supervision of locations at which drug shipments were received. In addition, ELIU ELIXANDER LORENZANA-CORDON was responsible for the acquisition and further distribution of quantities of drug shipments received.

## WITNESSES

10.     Confidential Source #1 (hereafter "CS1") was a high ranking member of

3

the Herrera-Garcia organization, who has been involved in drug trafficking activities with

the Herrera-Garcia organization for more than ten years. CS1 personally participated in

the drug trafficking activities of the Herrera-Garcia organization, and therefore has first-

hand knowledge of the Herrera-Garcia organization's operations. The information

provided by CS1 to law enforcement agents has been independently corroborated through

other sources of information, documentation of drug seizures, as well as verification of

information by independent methods.

      11.     Confidential Source #2 (hereafter "CS2") was a separate high ranking

member of the Herrera-Garcia organization and has been involved in drug trafficking

activities with the Herrera-Garcia organization for more than ten years. CS2 has

participated in the drug trafficking activities of the Herrera-Garcia organization and has

first-hand knowledge of the Herrera-Garcia organization's operations. The information

provided by CS2 has been independently corroborated through other sources of

information, documentation of drug seizures, as well as verification of information by

independent methods and has resulted in specific drug seizures. Additionally, the

information provided by CS2 has been independently corroborated by CS1.

      12.     Confidential Source #3 (hereinafter "CS3") was a member of the Herrera-

Garcia organization and had been involved in drug trafficking activities with the Herrera-

Garcia organization for approximately four years. CS3 participated in the drug

trafficking activities of the Herrera-Garcia organization and has first-hand knowledge of

aspects of the organization's operations. The information provided by CS3 has been

independently corroborated through other sources of information and documentation in

drug ledgers. Additionally, the information provided by CS3 has been independently

corroborated by CS1 and CS2.

13.      Confidential Source #4 (hereinafter "CS4") was a member of the Herrera-

Garcia organization and had been involved with the Herrera-Garcia organization for

approximately nine years.  CS4 has participated in the drug trafficking activities of the

Herrera-Garcia organization and has first-hand knowledge of the Herrera-Garcia

organization's operations.  The information provided by CS4 has been independently

corroborated through other sources of information, documentation of drug seizures, as

well as verification of information by independent methods.  In addition, the information

provided by CS4 has been independently corroborated by CS1 and CS2.

14.      Confidential Source #5 (hereinafter "CS5") was a member of a separate

drug trafficking organization in Guatemala and had been involved with the drug

trafficking organization for more than five years.  CS5 participated in the drug trafficking

activities of the organization and has first-hand knowledge of the organization's

operations.  The information provided by CS5 has been independently corroborated

through other sources of information, drug and money seizures, as well as verification of

information by independent methods.  In addition, the information provided by CS5 has

been independently corroborated by CS7 and CS8.

15.      Confidential Source #6 (hereinafter "CS6") was a high ranking member of

a drug transportation network for more than ten years and was responsible for the

coordination and transportation of drug shipments through Central American countries to

include Costa Rica, Nicaragua, Honduras, and Guatemala.  CS6 coordinated, was

contracted by, and provided transportation services to various drug trafficking

organization operating throughout Central America.  The information provided by CS6

has been independently corroborated through other sources of information, documentation of seizures, as well as verification of information by independent methods. In addition, the information provided by CS6 has been independently corroborated by separate cooperating sources.

16. Confidential Source #7 (hereinafter "CS7") was a member of the same drug trafficking organization as CS5 in Guatemala and had been involved with the drug trafficking organization for more than five years. CS7 participated in the drug trafficking activities of the organization and has first-hand knowledge of the organization's operations. The information provided by CS7 has been independently corroborated through other sources of information, drug and money seizures, as well as verification of information by independent methods. In addition, the information provided by CS7 has been independently corroborated by CS5 and CS8.

17. Confidential Source #8 (hereinafter "CS8") was a member of the same drug trafficking organization as CS5 and CS7 and had been involved with the drug trafficking organization for more than five years. CS8 participated in the drug trafficking activities of the organization and has first-hand knowledge of the organization's operations. The information provided by CS8 has been independently corroborated through other sources of information, drug and money seizures, as well as verification of information by independent methods. In addition, the information provided by CS8 has been independently corroborated by CS5 and CS7.

## LORENZANA-CORDON'S DRUG TRAFFICKING ACTIVITIES

18. According to CS1 and CS2, beginning in approximately 1997, the Herrera-Garcia organization began working with other drug traffickers to smuggle

cocaine from Colombia into Central America for onward distribution to Mexico, and

ultimately, the United States. From approximately 1999 to 2003, the Herrera-Garcia

organization essentially worked with the Lorenzana organization to receive, inventory

and store Colombian cocaine in Guatemala before it was ultimately imported and

distributed into the United States.

*Enough to indict or obtain a search warrant even arrest warrant*

19.     The Phanor Arizabaleta Arzayus drug trafficking organization (hereafter

"Arizabaleta organization") supplied the majority of cocaine to the Herrera-Garcia

organization. According to CS1, CS2, CS3, and CS4, for a year and a half period from

approximately 1999 until 2001, the cocaine was smuggled out of Colombia on "go-fast"

boats. Members of the Herrera-Garcia organization met the "go-fast" vessels at sea,

transferred the Colombian cocaine onto their own "go fast" boats, inventoried the

cocaine, and then transported the cocaine to the coast of El Salvador, where it was

offloaded and inventoried. From there, the cocaine was transferred to a secondary

storage location, further inland in El Salvador, where it was inventoried again by

members of the Herrera-Garcia organization.

20.     At this secondary location, the cocaine was loaded onto banana trucks and

transported from El Salvador to Guatemala. Primarily, the cocaine was delivered to a

warehouse complex near La Reforma, Zacapa, Guatemala, which was managed by ELIU

ELIXANDER LORENZANA-CORDON and used by various members of the Lorenzana

organization, including ELIU ELIXANDER LORENZANA-CORDON to receive drug

shipments.

21.     Additionally, from approximately 2000 to 2003, the Herrera-Garcia

organization coordinated the transportation of cocaine-laden aircraft from Colombia to

clandestine airstrips in Guatemala. The clandestine airstrips were located on or near

properties owned and/or utilized by the Lorenzana organization. According to CS1, CS2,

CS3, and CS4, members of the Lorenzana organization, including co-conspirator

Waldemar Lorenzana-Cordon, Jr., were present at the clandestine airstrips and/or the

nearby storage facilities to oversee and/or participate in the inventory of the cocaine.

After the cocaine was offloaded and inventoried at these properties, the cocaine was

transported via truck to the warehouse complex utilized by the Lorenzana organization in

Zacapa, Guatemala. The logistical coordination of these shipments was conducted –

either entirely or in part – by members of the Lorenzana organization, including ELIU

ELIXANDER LORENZANA-CORDON and co-conspirator Haroldo Lorenzana.

22.     According to CS1, CS2, and CS4, when the cocaine-laden trucks arrived

at the warehouse complex, the cocaine was offloaded by members of the Herrera-Garcia

organization. The cocaine was then inventoried by Otto Herrera-Garcia, Byron Linares,

and others. CS1, CS2, and CS4 indicated that ELIU ELIXANDER LORENZANA-

CORDON and co-conspirators Haroldo Lorenzana, and Waldemar Lorenzana-Cordon, Jr.

were often present during the inventory process.

23.     CS1 has stated that, following the inventory process at the warehouse

complex in Zacapa, Guatemala, arrangements were made by Otto Herrera-Garcia to

distribute the cocaine to the owners of the cocaine who were members of several

Mexican drug trafficking organizations. Members of the Arizabaleta organization

directed the distribution of cocaine to the Mexican drug trafficking organization owners.

24.     CS1, CS2, and CS3 have identified Byron Linares as the link between the

Herrera-Garcia organization and the Lorenzana organization. According to CS1, CS2,

and CS3, the money received from the sale of the cocaine, all in United States currency, was gathered and inventoried at the warehouse complex by Linares and others. The money would then be transported to one of two houses in Zone 14, Guatemala City, Guatemala, where it was counted by Otto Herrera, Linares, and others. After the count was agreed upon by all parties, the money was turned over to members of the Arizabaleta organization, who were responsible for delivery of the money back to Colombia.

25.     Furthermore, CS1, CS2, and CS3 have all indicated that Linares was responsible for the accounting aspect of the Lorenzana organization. CS1, CS2, and CS3 each had significant dealings with Linares and each are aware that Linares collected drug trafficking proceeds, maintained detailed accounting ledgers, and repatriated the proceeds from drug trafficking activities to members of the Arizabaleta drug trafficking organization.

26.     During the course of this investigation, DEA Special Agents assigned to the Guatemala Country Office identified residences located at 22 Calle 10-56 and 22 Calle 10-64, Zona – 14, Guatemala City, Guatemala, as residences associated with Otto Herrera-Garcia and observed Otto Herrera-Garcia, Linares, and Guillermo Herrera-Garcia at these residences.

27.     On April 2, 2003, Special Agents of the DEA assisted Guatemalan law enforcement authorities in the lawful execution of a search warrant at the two residences in Guatemala City, Guatemala. Pursuant to the execution of the search warrant, approximately $14 million dollars in U.S. currency was seized from these residences. Accounting ledgers detailing income and expenses of the Lorenzana and other organizations were seized. Also seized were assault rifles, a handgun, grenades, cellular

telephones, a satellite telephone, a passport belonging to Otto Herrera-Garcia, vehicles,

including a vehicle registered to Guillermo Herrera-Garcia, and numerous documents.

Co-conspirator Jose Fernando Arizabaleta-Lenis was present at the time of the search.

28.     CS1 and CS2 have reviewed portions of photocopies of the accounting

ledgers seized on April 2, 2003, and have identified references to several members of the

Lorenzana organization within the ledgers, to include ELIU ELIXANDER

LORENZANA-CORDON.     The payments reflected in these accounting ledgers show

that the various members of the Lorenzana organization, including ELIU ELIZANDER

LORENZANA-CORDON, co-conspirators Byron Linares, Haroldo Lorenzana, and

others made payments to or were paid by a member of the Herrera-Garcia organization

for cocaine trafficking activities in United States dollars. The dates included in the

accounting ledgers indicate that many of these payments were made during 2001. CS1

and CS2 have further identified that many portions of the ledgers were authored by Byron

Linares since he served as the Lorenzana organization accountant.

29.     CS1 stated that ELIU ELIXANDER LORENZANA-CORDON and co-

conspirators Byron Linares, Otto Herrera-Garcia, Haroldo Lorenzana, and Waldemar

Lorenzana-Cordon, Jr. met in Guatemala in approximately February 2004 to discuss the

seizures from the previous year, and specifically discussed the fact that Linares'

accounting ledgers were among the documents seized during the execution of the

warrants in 2003 at the properties in Zone 14, Guatemala City, Guatemala.

30.     CS1, CS2, CS3 and CS4 identified various logos from the cocaine

shipments that were transported by the Herrera-Garcia organization and distributed to the

Lorenzana organization, for which Linares provided accounting and inventory services.

CS1 and CS2 viewed photographs from several seizures of cocaine in the United States

and identified logos on the packaging from the seizures in the United States as the same

or similar logos as those that appeared on the cocaine transported by the Herrera-Garcia

organization.

31.     The investigation also revealed that members of the Lorenzana

organization did not work exclusively with members of the Herrera Organization.  They

contracted and worked with other drug trafficking organizations to transport drugs.

According to CS5, in approximately 2002 in Guatemala, ELIU ELIXANDER

LORENZANA-CORDON met Jorge Mario Paredes-Cordova, identified by CS5 as the

head of a drug trafficking organization.

32.     According to CS6, CS6 met ELIU ELIXANDER LORENZANA-

CORDON on approximately two occasions in October/November 2005.  On each

occasion, CS6 was present when five hundred kilogram shipments of cocaine were

delivered to ELIU ELIXANDER LORENZANA-CORDON and Waldemar Lorenzana-

Cordon, Jr. in Guatemala.  CS6 advised that ELIU ELIXANDER LORENZANA-

CORDON and Waldemar Lorenzana-Cordon Jr. were in charge of receiving both drug

shipments on behalf of the Lorenzana drug trafficking organization.

33.     According to CS7, CS7 was present in late 2006 at a cocaine

processing/packaging laboratory in Zacapa, Guatemala.  CS7 described that the

laboratory was primarily used for the purpose of accepting delivery of and "cutting"

(mixing with other diluents to increase the volume of) cocaine.  CS7 related that he/she

was originally introduced to ELIU ELIXANDER LORENZANA-CORDON by the

owner of the laboratory and that CS7 saw ELIU ELIXANDER LORENZANA-

CORDON present at the laboratory site.

34.     According to CS8, CS8 was present when members of the Lorenzana organization, including ELIU ELIXANDER LORENZANA-CORDON, delivered two shipments of cocaine.  Specifically, CS8 stated that in 2005, ELIU ELIXANDER LORENZANA-CORDON delivered a shipment of 400 kilograms cocaine that had been stored in a Lorenzana warehouse in Zacapa, Guatemala.  CS8 further indicated that in 2006 members of the Lorenzana organization, including ELIU ELIXANDER LORENZANA-CORDON, delivered a shipment of 300 kilograms of cocaine that had been stored at a Lorenzana farm and that ELIU ELIXANDER LORENZANA-CORDON was present.  CS8 further advised that CS8 was present on two occasions when ELIU ELIXANDER LORENZANA-CORDON repatriated money pursuant to the two drug shipments referenced above.

35.     ELIU ELIXANDER LORENZANA-CORDON is a Guatemalan citizen born on November 29, 1971 in Guatemala.  ELIU ELIXANDER LORENZANA-CORDON  has used the alias Elio Elixander Lorenzana-Cordon.  He is described as a Hispanic male, standing approximately 5 feet, 5 inches tall, and weighing approximately 170 pounds.  LORENZANA-CORDON'S cedula number is R-19-4478.

36.     CS1, CS2, CS3, CS4, CS5, CS6, CS7, and CS8 have viewed the

photograph, attached to my affidavit as **Attachment 1**, and identified LORENZANA-

CORDON as one of the primary members involved in the drug trafficking conspiracy

whose drug trafficking activities are described above.

Stephen Fraga, Special Agent
Drug Enforcement Administration

SWORN AND SUBSCRIBED BEFORE ME
on this  9  day of  December  , 2011

HONORABLE JOHN FACCIOLA
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA