# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

WALDEMAR LORENZANA-LIMA,
also known as Valdemar Lorenzana-Lima

Criminal Case Number 03-331

AFFIDAVIT IN SUPPORT
OF REQUEST FOR
EXTRADITION

Exhibit. D

I, Mary Toscano, being duly sworn, hereby depose and state:

1. I am a citizen of the United States.

2. In May 2002, I received a Bachelor of Arts degree from Georgetown University in Washington, D.C. In June 2005, I received a Juris Doctor degree from the University of Buffalo School of Law in Buffalo, New York. I was admitted to the Bar of the State of New York in 2006.

3. From August 2005 through September 2007, I was employed as an appellate attorney for the New York State Supreme Court, Appellate Division, Fourth Department in Rochester, New York.

4. Since October 2007, I have been employed by the United States Department of Justice as a Trial Attorney for the Criminal Division's Narcotic and Dangerous Drug Section. As a Trial Attorney, my duties include the investigation, prosecution, and trial of narcotics offenses based on criminal violations of the laws of the United States. Based on my training and experience, I am familiar with the criminal laws and procedures of this district and of the United States, as well as the extradition laws of the United States.



RECEIVED
MAY 16 2022

-1-

5. Given my assignment to the Narcotic and Dangerous Drug Section, I am particularly knowledgeable in the area of law relating to violations of the federal narcotics statutes, including Title 21, United States Code, Section 963, attempt or conspiracy to commit narcotics offenses; Title 21, United States Code, Section 952, importation of a controlled substance into the United States; Title 21, United States Code, Section 959, manufacture and distribution of a controlled substance knowing or intending such controlled substance will be imported into the United States; Title 21, United States Code, Section 960 (penalties); and Title 18, United States Code, Section 2, aiding, abetting, counseling, commanding, inducing, procuring or causing the commission of an offense against the United States.

6. In the course of my official duties, I have become familiar with the charges and evidence against WALDEMAR LORENZANA-LIMA, also known as "Valdemar Lorenzana-Lima" (hereinafter "LORENZANA-LIMA"), Haroldo Geremias Lorenzana-Cordon, also known as "Chuci," also known as "Chuchy," (hereinafter "Haroldo Lorenzana"), Eliu Elixander Lorenzana-Cordon (hereinafter "Eliu Lorenzana"), Waldemar Lorenzana-Cordon, also known as "Valdemar Lorenzana-Cordon" (hereinafter "Waldemar Lorenzana Jr."), Carlos Andres Alvarenga-Mejia, also known as "Patudo" (hereinafter "Alvarenga-Mejia"), Gonzalo Lopez-Cabrera, also known as "Lalo," also known as "Chalo," also known as "Chalito" (hereinafter "Lopez Cabrera"), and others, in the case captioned <u>United States of America v. Guillermo Herrera-Garcia et al.</u>, Criminal Case number 03-331. This case arose out of a conspiracy to distribute thousands of kilograms of cocaine into the United States. The charges against LORENZANA-LIMA, Haroldo Lorenzana, Eliu Lorenzana, Waldemar Lorenzana Jr., Alvarenga-Mejia, Lopez-

Cabrera, and their co-defendants were brought as a result of an investigation by the United States Drug Enforcement Administration (hereinafter "DEA") of the Herrera-Garcia drug trafficking organization, an investigation which has been ongoing since 1999. Thus far, nine of the 13 individuals named in the Second Superseding Indictment remain fugitives. The Second Superseding Indictment remains sealed except for copies to be used by law enforcement personnel during execution of their official duties in the investigation and for extradition of the fugitives.

## THE GRAND JURY PROCESS

7.    Under the laws of the United States, a criminal prosecution may be commenced by a grand jury on its own decision to return and file an indictment with the Clerk of the United States District Court. A grand jury is composed of at least 16 people whom the United States District Court selects at random from the residents of the District of Columbia. The grand jury is part of the judicial branch of the United States Government. The purpose of the grand jury is to review the evidence of crimes presented to it by United States law enforcement authorities. After independently reviewing this evidence, each member of the grand jury must determine if there is probable cause to believe that a crime has been committed, and that the particular defendant committed the crime. A grand jury returns an indictment when at least 12 grand jurors have voted in favor of an indictment. An indictment is a formal document that charges the defendant with a crime or crimes, describes the specific laws that the defendant is accused of violating, and describes the acts of the defendant that are alleged to be violations of the law. After the grand jury returns the indictment, a warrant for the defendant's arrest is

Case 1:03-cr-00331-CKK   Document 874-1   Filed 10/12/16   Page 4 of 18

issued by a United States Magistrate Judge. A grand jury may also return a superseding indictment, which amends the accusations.

8. If further evidence is later presented to the grand jury as to the matters for which an indictment is already returned, the grand jury may return a superseding indictment in the same fashion as with an original indictment. In such a case, the superseding indictment takes the place of the previous indictment. A warrant for the arrest of the defendant or defendants may be issued from a superseding indictment. This case involves a second superseding indictment against LORENZANA-LIMA, Haroldo Lorenzana, Eliu Lorenzana, Waldemar Lorenzana Jr., Alvarenga-Mejia, and Lopez-Cabrera (collectively referred to as "the Defendants").

## THE CHARGES AND PERTINENT UNITED STATES LAW

9. On July 31, 2003, a federal grand jury sitting in the District of Columbia returned and filed an Indictment in Criminal Case Number 03-331 against William Eliu Martinez (hereafter "Eliu Martinez") and David Sabas Arias-Martinez (hereafter "Arias-Martinez") for violating various federal laws. The charges against William Eliu Martinez and Arias Martinez were eventually resolved, but only after the return and filing of a Superseding Indictment on October 30, 2003. In 2005, William Eliu Martinez was convicted of his involvement in the conspiracy and sentenced to 29 years in prison. The charges against Arias Martinez were dismissed after he testified against William Eliu Martinez and so he could serve a sentence for related charges in El Salvador.

10. On October 30, 2003, a Superseding Indictment in Criminal Case Number 03-331 was returned against Otto Herrera-Garcia, Guillermo Herrera-Garcia, and Byron Linares, charging them with violating narcotics and conspiracy laws, including the

following: knowingly and intentionally conspiring to: (1) import five kilograms or more of cocaine into the United States from the Republics of Colombia, El Salvador, Guatemala, and Mexico; and (2) manufacture and distribute five kilograms of cocaine, intending and knowing that such substance would be unlawfully imported into the United States, all in violation of Title 21, United States Code, Sections 959 and 960.

11. On March 10, 2009, a federal grand jury sitting in the District of Columbia returned and filed a Second Superseding Indictment in Criminal Case Number 03-331 against LORENZANA-LIMA, Haroldo Lorenzana, Eliu Lorenzana, Waldemar Lorenzana Jr. Alvarenga-Mejia, and Lopez-Cabrera, among others, charging them in a single count with conspiring: (1) to unlawfully, knowingly and intentionally, import into the United States five kilograms or more of cocaine from the Republic of Colombia. El Salvador, Guatemala, and Mexico; and (2) to manufacture and distribute five kilograms or more of a mixture and substance containing a detectible amount of cocaine, intending and knowing that such substance would be unlawfully imported into the United States, all in violation of Title 21, United States Code, Sections 952, 959, 963, and 960(b)(1)(B)(ii) and Title 18, United States Code, Section 2. Cocaine is a Schedule II controlled substance, pursuant to Title 21, United States Code, Section 812. The Second Superseding Indictment also seeks the forfeiture of the Defendants' property, which was used either to commit the crimes, or represents the proceeds of the crimes, pursuant to the relevant portions of Title 21, United States Code, Section 853.

12. On March 10, 2009, warrants for the arrests of LORENZANA-LIMA and the other Defendants were issued by the United States District Court for the District of

Columbia, based on the charges contained in the Second Superseding Indictment in Criminal Case Number 03-331.

13. It is the practice of the United States District Court for the District of Columbia to retain the original indictment, including any superseding indictments, and warrants of arrest and file them with the Clerk of the Court. Therefore, I have obtained certified and true copies of the Second Superseding Indictment and warrant of arrest for LORENZANA-LIMA from the Clerk of the Court and have attached them to this affidavit as **Exhibit A** and **B**, respectively.

14. LORENZANA-LIMA, Haroldo Lorenzana, Eliu Lorenzana, Waldemar Lorenzana Jr., Alvarenga-Mejia, and Lopez-Cabrera are charged in Count One with participating in a conspiracy to distribute and import cocaine, a controlled substance in violation of Title 21, United States Code, Sections 952 and 959, into the United States. Under United States law, a conspiracy is simply an agreement to violate another criminal statute, in this instance the laws prohibiting the distribution and importation of cocaine. In other words, the act of agreeing, or coming to a mutual understanding with one or more other persons to violate United States law is a crime in and of itself. Such an agreement need not be formal, and may be simply a verbal or implicit understanding. A conspiracy is deemed to be a partnership for criminal purposes in which each member or participant becomes the agent or partner of every other member.

15. Under the laws of the United States, to prove the felony offense of conspiracy charged in the single count of the Second Superseding Indictment, the United States must show that the Defendants came to an agreement with one or more persons to accomplish an unlawful plan, as charged in the Second Superseding Indictment, and that

-6-

the Defendants knowingly and willfully became members of the conspiracy in this case, LORENZANA-LIMA, Haroldo Lorenzana, Eliu Lorenzana, Waldemar Lorenzana, Alvarenga-Mejia, and Lopez-Cabrera are charged along with numerous co-conspirators. The Defendants need not be aware of all of the acts of their co-conspirators in order to be held liable for these acts, provided that they are knowing members of the conspiracy, and the acts of the co-conspirators were foreseeable and within the scope of the conspiracy. A person may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names and identities of all of the other alleged conspirators. Accordingly, if a defendant has an understanding of the unlawful nature of a plan and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict him for conspiracy even if he had not participated before and even if he played only a minor part.

16.   LORENZANA-LIMA and others are charged in Count One with participating in a conspiracy to distribute and import cocaine, a controlled substance in violation of Title 21, United States Code, Sections 952 and 959, into the United States. Regarding this offense, the United States must show specifically that (1) LORENZANA-LIMA and one or more persons, directly or indirectly, reached an agreement to import and distribute a controlled substance, specifically cocaine; (2) that LORENZANA-LIMA knew that the cocaine would be unlawfully imported into the United States; (3) that LORENZANA-LIMA knew of the unlawful purpose of the agreement; (4) that LORENZANA-LIMA joined in the agreement willfully, that is, with the intent to further its unlawful purpose; and, (5) that the overall scope of the conspiracy involved at least five kilograms of a mixture or substance containing a detectable amount of cocaine.

-7-

The relevant portions of the statutes cited above are attached to this Affidavit as **Exhibit C**. These statutes were duly enacted and in force at the time the offenses were committed and at the time the Second Superseding Indictment was returned. They remain in full force and effect. A violation of any of these statutes constitutes a felony under the laws of the United States. **Exhibit C** includes the applicable conspiracy statute with which the Defendants are charged. This statute establishes the crime of conspiracy as charged in the Second Superseding Indictment.

18. The statute of limitations for prosecuting the crimes charged in the Second Superseding Indictment is governed by Title 18, United States Code, Section 3282, the relevant text of which is included in **Exhibit C**. The statute of limitations merely requires that a defendant be formally charged within five years of the date that the offense or offenses were committed. The statute of limitations on a charge of conspiracy does not begin to run until the commission of the last overt act done in furtherance of the conspiracy. Once an indictment has been filed in a federal district court, as with these charges against the Defendants, the statute of limitations is tolled and no longer runs. This prevents a criminal from escaping justice by simply fleeing apprehension and remaining a fugitive for an extended period of time. Moreover, under the laws of the United States, the statute of limitations for a continuing offense, such as conspiracy, begins to run upon the conclusion of the conspiracy, not upon the commencement of the conspiracy.

19. I have thoroughly reviewed the applicable statute of limitations. Since the applicable statute of limitations is five years, and the Second Superseding Indictment, which charges criminal violations occurring from March 1996, the exact date being

-8-

unknown to the Grand Jury, continuing thereafter up to and including the date of the filing of the Second Superseding Indictment, on March 19, 2009, the Defendants were formally charged within the prescribed five-year time period. The prosecution of the charges in this case, therefore, is not barred by the statute of limitations.

20. The maximum penalty for this offense as provided by Title 21, United States Code Section 960, is life imprisonment.

21. The United States will prove its case against LORENZANA-LIMA, Haroldo Lorenzana, Eliu Lorenzana, Waldemar Lorenzana Jr., Alvarenga-Mejia, and Lopez-Cabrera through witness testimony, physical evidence, and other corroborating evidence. LORENZANA-LIMA has not been tried or convicted of any offenses charged in the Second Superseding Indictment nor has he been sentenced to serve any sentence in connection with this case.

## SUMMARY OF THE FACTS OF THE CASE

22. In approximately June of 1999, the DEA opened an investigation into the Herrera-Garcia drug trafficking organization (hereafter "organization"), which has been operating out of Guatemala since the late 1990s. The investigation identified Otto Herrera-Garcia (hereinafter "Otto Herrera") as the leader of the organization, and Otto Herrera's brother, Guillermo Vinicio Herrera-Garcia, also known as Willy (hereinafter "Guillermo Herrera"), as the organization's logistical coordinator. Over time, the Herrera-Garcia organization has been responsible for facilitating the smuggling of multi-ton shipments of cocaine through an international narcotics trafficking organization that transported cocaine from Colombia to El Salvador, Guatemala, and Mexico for importation to, and distribution in, the United States.

23. Based upon their investigation, the DEA and their foreign counterparts learned that the Herrera-Garcia organization essentially hired other drug trafficking organizations to assist the Herrera-Garcia organization with the transportation of cocaine shipments from Colombia through Central America and on to Mexico for ultimate importation to and distribution in the United States. The investigation identified one of these drug trafficking organizations as the Lorenzana drug trafficking organization (hereinafter "Lorenzana organization"), a narcotics trafficking organization operating out of Guatemala. The Lorenzana organization worked with the Herrera-Garcia organization from the late 1990s until at least 2003 by assisting the Herrera-Garcia organization with the receipt, inventory and storage of cocaine in Guatemala.

24. The DEA investigation has revealed that LORENZANA-LIMA is the leader of the Lorenzana organization. Haroldo Lorenzana, Eliu Lorenzana, and Waldemar Lorenzana Jr., who are LORENZANA-LIMA's sons, are members of the Lorenzana organization who distribute cocaine in Guatemala that is ultimately destined for the United States. As the leader of the Lorenzana organization, LORENZANA-LIMA directed his drug trafficking contacts to work with his sons, and in return, LORENZANA-LIMA received a percentage of the narcotics proceeds from each cocaine shipment received, transported or distributed by any member of the Lorenzana organization, including Haroldo Lorenzana, Eliu Lorenzana, and Waldemar Lorenzana Jr. LORENZANA-LIMA also instructed his drug trafficking contacts to tell him whenever a contact transported and delivered a load so LORENZANA-LIMA would know to charge the appropriate member of the Lorenzana organization, including his sons, so the members would pay a percentage of the narcotics proceeds for each shipment to

-10-

LORENZANA-LIMA. LORENZANA-LIMA also delegated the managerial duties of several properties in Guatemala, including a ranch commonly referred to as Las Cañas that was used to receive and store cocaine shipments.

25. United States law enforcement authorities learned from witnesses that in addition to their own cocaine trafficking activities, Haroldo Lorenzana, Eliu Lorenzana, and Waldemar Lorenzana Jr. received, inventoried, and stored cocaine that was transported from Colombia by both a Salvadorian go-fast boat operation established by William Eliu Martinez and utilized by the Herrera organization and cocaine-laden aircraft that was received by members of the Herrera-Garcia organization at clandestine airstrips in Guatemala. According to witnesses, after the cocaine was inventoried in either El Salvador or Guatemala and then moved via truck to Guatemala, the cocaine was offloaded, inventoried and stored at various properties owned by the Lorenzana family before it was ultimately distributed to Mexican drug traffickers. According to witnesses, the Mexican drug traffickers were in turn responsible for the importation and distribution of the cocaine in the United States.

26. Witness testimony has also established that Alvarenga-Mejia and Lopez-Cabrera, drug trafficking associates of Otto Herrera, participated in the transportation of cocaine from El Salvador to Guatemala. Once in Guatemala, Alvarenga-Mejia and Lopez-Cabrera were present at the Lorenzana warehouse complex to inventory the cocaine before it was distributed to other Mexican drug traffickers for ultimate distribution to and importation in the United States. The specific activities of the individual Defendants are detailed below.

27. The majority of the shipments transported by the Herrera-Garcia

-11-

organization from approximately 1999 to 2003 went through the Lorenzana warehouse complex and/or were received and stored at one of the Lorenzana properties in Guatemala. Two witnesses identified various logos from the cocaine shipments that were transported by the Herrera-Garcia organization. Further, these two witnesses viewed photographs from several seizures of cocaine in the United States and identified logos on the packaging from the seizures in the United States as the same or similar logos as those that appeared on the cocaine transported by the Herrera-Garcia organization.

### HAROLDO LORENZANA and ELIU LORENZANA

28. According to witnesses, between approximately 1999 and 2002, Haroldo Lorenzana and Eliu Lorenzana handled most of the cocaine shipments received by the Lorenzana organization at a warehouse complex near La Reforma, Zacapa, Guatemala. According to at least one witness, while LORENZANA-LIMA owned the warehouse complex, Eliu Lorenzana managed it. Meanwhile, other members of the Lorenzana organization, including Haroldo Lorenzana, used the warehouse complex to inventory and store most of cocaine shipments received by the organization. Haroldo Lorenzana, Eliu Lorenzana, and Waldemar Lorenzana Jr. generally were present at the warehouse complex for the receipt, offloading, and inventorying of cocaine shipments. According to witnesses, once the cocaine was inventoried, some of the cocaine was distributed to members of Mexican drug trafficking organizations, who were then responsible for distributing the cocaine to the United States.

29. Haroldo Lorenzana distributed any remaining cocaine to his local Mexican drug trafficking contacts. According to a witness, if Haroldo Lorenzana was unable to sell the cocaine personally, he would distribute the cocaine shipment among his siblings,

-12-

including co-defendants and co-conspirators Eliu Lorenzana and Waldemar Lorenzana Jr. In turn, the Lorenzana siblings, including Eliu Lorenzana and Waldemar Lorenzana Jr., sold the cocaine to their various contacts, all of whom were Mexican drug traffickers operating out of Guatemala. Kilograms of cocaine provided to the various members of the Lorenzana organization, including Haroldo Lorenzana and Eliu Lorenzana, as well as payments made by the Lorenzanas to the Herrera-Garcia organization, are reflected in drug ledgers and log books that were seized from various properties in Guatemala City in April 2003. These properties were known to be utilized by the Herrera-Garcia organization. The payments reflected in these drug ledgers show that the various members of the Lorenzana organization, including Haroldo Lorenzana and Eliu Lorenzana, made payments to a member of the organization for the cocaine in United States dollars. The dates included in the drug ledgers indicate that many of these payments were made during 2001.

30.     Haroldo Lorenzana also participated in the collection and accounting of drug proceeds at the warehouse complex. After Haroldo Lorenzana completed an initial accounting of the drug proceeds, the money was transported to a stash house in Guatemala City where the drug proceeds were counted by fellow co-defendants and co-conspirators, among others. As previously indicated, these properties were known to be utilized by the Herrera-Garcia organization, and search warrants were executed at these properties in April 2003. Pursuant to the execution of said warrants, over $14 million in United States currency was seized. In addition, as previously indicated, drug ledgers and log books were also seized pursuant to the execution of the search warrants. One entry indicates that the Herrera-Garcia organization owed Haroldo Lorenzana $81,900 United

-13-

States dollars, but Haroldo Lorenzana owed the Herrera-Garcia organization $27,000 United States dollars. Another entry indicates that Haroldo Lorenzana paid United States currency to purchase cocaine from the Herrera-Garcia organization. Another entry in the drug ledger records the amount of cocaine sold by the Herrera-Garcia organization to Eliu Lorenzana, as well as payments made by Eliu Lorenzana to the Herrera-Garcia organization in United States currency for that cocaine.

### WALDEMAR LORENZANA JR.

31. In addition to being present at the warehouse complex and selling cocaine when it was available, Waldemar Lorenzana Jr. was also present at properties owned by members of the Lorenzana organization that were used by the Herrera-Garcia organization to receive cocaine-laden aircraft. Waldemar Lorenzana Jr. provided security to the cocaine as it was transported from clandestine airstrips to the warehouse complex, where the cocaine was inventoried and stored by members of the Lorenzana organization, including Haroldo Lorenzana and Eliu Lorenzana, prior to its distribution to Mexican drug traffickers.

### ALVARENGA-MEJIA and LOPEZ-CABRERA

32. As members of the Herrera-Garcia organization, Alvarenga-Mejia and Lopez-Cabrera were involved in the El Salvadorian go-fast operation established by William Eliu Martinez and utilized by the Herrera-Garcia DTO.

33. Specifically, from 1999 through at least 2002, Lopez-Cabrera assisted David Sabas Arias-Martinez, a former co-defendant and co-conspirator who served as a go-fast captain for William Eliu Martinez's drug trafficking organization, with coordinating the cocaine shipments that arrived from Colombia off the coast of El

-14-

Salvador. Lopez-Cabrera also served as either captain or co-captain of the go-fast vessels used to receive cocaine—which had been transported from Colombia via maritime vessels—off the coast of El Salvador. Lopez-Cabrera was responsible for inventorying the cocaine as it was offloaded from the maritime vessels and loaded onto the go-fast vessels. In addition, after the cocaine was transported from the maritime vessels to the coast of El Salvador, Lopez-Cabrera participated in the offloading and inventorying of the cocaine in El Salvador.

34. Once the cocaine was inventoried by the Herrera-Garcia organization, Lopez-Cabrera would travel with other members of the Herrera-Garcia organization from El Salvador to Guatemala. In Guatemala, the cocaine was generally delivered to the warehouse complex managed by Eliu Lorenzana and frequently used by Haroldo Lorenzana. Lopez-Cabrera assisted with the offloading and inventorying of the cocaine at the Lorenzana warehouse complex. Lopez-Cabrera was paid by the Herrera-Garcia organization for these services. Indeed, an entry in the drug ledgers seized from the Guatemala City properties in April 2003 reflects the payment of $125,000 in United States currency to Lopez-Cabrera by the Herrera-Garcia organization. A separate entry, dated March 20, 2002, reflects the payment of $170,000 to Lopez-Cabrera by the Herrera-Garcia organization.

35. Like Lopez-Cabrera, from 1999 through at least 2002, Alvarenga-Mejia participated in the offloading of the cocaine from the speed boats once they arrived in El Salvador. Alvarenga-Mejia helped move the cocaine to a nearby storage facility, where it was inventoried. Once an inventory of the cocaine shipment was complete, Alvarenga-Mejia helped load the cocaine onto trucks, which were then used to transport the cocaine

from El Salvador to Guatemala.

36. Like Lopez-Cabrera, Alvarenga-Mejia traveled with other members of the Herrera-Garcia organization from El Salvador to Guatemala. Once in Guatemala, cocaine was generally delivered to the warehouse complex managed by Eliu Lorenzana and frequently used by Haroldo Lorenzana. At the warehouse complex, Alvarenga-Mejia participated in offloading the cocaine from trucks, as well as the inventorying of the cocaine. Alvarenga-Mejia was paid by the Herrera-Garcia organization in United States currency for his various drug trafficking services.

37. In addition, as documented by drug ledgers seized pursuant to the aforementioned search warrants executed at properties utilized by the Herrera-Garcia organization in Guatemala City, Guatemala, Alvarenga-Mejia purchased cocaine from the Herrera-Garcia organization, which Alvarenga-Mejia was responsible for distributing. Alvarenga-Mejia paid United States currency to purchase the kilograms of cocaine.

## IDENTIFICATION

38. LORENZANA-LIMA is a Guatemalan citizen, born on February 19, 1940. He is described as a Hispanic male, standing approximately 5 feet, 10 inches tall, and weighing approximately 185 pounds. A photograph of LORENZANA-LIMA is attached to the affidavit of Drug Enforcement Administration Special Agent Stephen Fraga as **Attachment 1** and made part of this extradition request. Confidential sources have identified the photograph of LORENZANA-LIMA and identified LORENZANA-LIMA as the leader and organizer of the LORENZANA drug trafficking organization.

## CONCLUSION

39. I have attached to this affidavit, as **Exhibit D**, the affidavit of Special

Agent Fraga. In his affidavit, Special Agent Fraga summarizes the investigation of the drug trafficking activities of LORENZANA-LIMA, Haroldo Lorenzana, Eliu Lorenzana, Waldemar Lorenzana Jr., Alvarenga-Mejia, and Lopez-Cabrera, as well as the evidence that resulted in the Second Superseding Indictment in this case. This affidavit was sworn to before a United States Magistrate Judge duly empowered to administer an oath for this purpose.

40. I have reviewed the affidavit of Special Agent Fraga and the evidence in this case and attest that the evidence is sufficient according to the laws of the United States to justify the committal for trial of LORENZANA-LIMA for the offense for which extradition is sought.

_____
MARY TOSCANO
Trial Attorney

SWORN AND SUBSCRIBED BEFORE
ME THIS __31st__ DAY OF MAY, 2011

_____
HON. JOSEPH A. DICKSON
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW JERSEY